UNITED STATES of America

v.

Peter J. SERUBO et al.

Cr. No. 78–71.

United States District Court,
E. D. Pennsylvania.

Memorandum & Order Aug. 24, 1978.

On Motion to Dismiss and to Suppress
Evidence Sept. 1, 1978.

Louis R. Pichini, Special Atty., Philadelphia Strike Force, Joel M. Friedman, Atty. in Charge Philadelphia Strike Force, Philadelphia, Pa., Peter J. Vaira, U. S. Atty., Philadelphia, Pa., for plaintiff.

Thomas B. Rutter, Stanley M. Shingles, Philadelphia, Pa., for Peter J. Serubo.

Louis W. Fryman, Philadelphia, Pa., for Donald Brown.

Thomas A. Masterson, John M. Phelan, Morgan, Lewis & Bockius, Philadelphia, Pa., for W. Thomas Plachter.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

A grand jury brought a thirteen-count indictment against the defendants in this case. In Count I, defendants Peter J. Serubo, W. Thomas Plachter, Jr., and Donald H. Brown are charged with conspiracy to evade the corporate taxes of the Plachter-Serubo Cadillac Company [Company] for the years 1971–73. Counts II, III and IV charge Serubo with evasion of personal income taxes for the years 1971–73 and Counts V, VI and VII charge Plachter with evasion of personal income taxes for the same period. Evasion of the Company's corporate taxes for the years 1971–73 is charged against Plachter, as President of the Company, and Serubo, as Secretary of the Company, in Counts VIII, IX and X. Brown, as Controller of the Company, is charged in the remaining three counts with aiding and abetting Plachter and Serubo's evasion of corporate income taxes for the same period.

Although they join in each other's motions, all defendants individually have moved for severance and have proposed different ways to sever the indictment. Brown requests that the case be divided in two; he seeks to sever the conspiracy count (Count I) and the aiding and abetting counts (Counts XI, XII, XIII) from those remaining. Plachter contends that the Court is required to sever the counts charging him with personal income tax evasion (Counts V, VI, VII) from those charging Serubo with similar offenses (Counts II, III, IV) and to try these counts separately from those involving the Company's taxes (Counts, I, VIII, IX, X, XI, XII, XIII). While agreeing that the personal income tax evasion counts should be severed from the remaining counts and severed between the two defendants, Serubo seeks to further sever the counts involving the Company so that those charging Brown with aiding and abetting (Counts XI, XII, XIII) are severed from the remaining conspiracy (Count I) and corporate tax (Counts VIII, IX, X) counts. The defendants' motions are made under Rules 8 and 14 of the Federal Rules of Criminal Procedure. After having considered the facts and law relevant to the motions, the Court concludes that they must be denied at this point.

■ Rule 8 defines the scope of permissible joinder of offenses and defendants. It provides:

(a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

If offenses or defendants are misjoined under Rule 8, the trial court has no discretion; it must grant severance. *United States v. Hilliard,* 436 F.Supp. 66 (S.D.N.Y.1977).

In this case, defendants raise two Rule 8 challenges to the indictment. First, they claim that the joinder of the personal income tax evasion counts with those involving the Company is improper because the indictment does not allege the necessary factual connection between counts. Secondly and similarly, they argue that the counts charging Serubo with personal income tax evasion have been misjoined with those counts charging Plachter with similar offenses as the government has not alleged "participat[ion] in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

The Court agrees with defendants that the factual allegations required under Rule 8 are absent from the indictment. The indictment neither explicitly nor implicitly

connects the personal income tax counts with the Company's tax counts nor states the relation between Serubo's alleged personal tax offenses and those of Plachter. It should be noted that the conspiracy count does not allege as overt acts Serubo and Plachter's alleged personal income tax evasion.

Nevertheless, the Court finds that, although it is much better practice to state the "connecting" allegations required by Rule 8 in the indictment, the absence of these allegations from the indictment is not dispositive of a Rule 8 motion. Government representations made in other pretrial proceedings and documents as to the factual connections between the counts may satisfy the requirements of Rule 8. *United States v. Franks,* 511 F.2d 25 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975); *King v. United States,* 355 F.2d 700 (1st Cir. 1966); *United States v. Florio,* 315 F.Supp. 795 (E.D.N.Y.1970); *United States v. Borish,* 452 F.Supp. 518 (E.D.Pa.1978). As generally recognized, Rule 8 balances court convenience and prejudice against defendants by joinder of offenses and defendants. 8 *Moore's Federal Practice* ¶ 8.02. It is "intended to proscribe joinder only where the presumptive benefits from joinder are clearly outweighed by the potential prejudice to the defendants." *United States v. Florio, supra,* 315 F.Supp. at 797. Therefore, a technical reading of Rule 8 which requires the factual connection to be outlined in the indictment is not mandated by the policies of Rule 8. If the necessary connection between counts is present, whether or not it is stated in the indictment, then presumably the prejudice that Rule 8 seeks to protect defendants from is absent and trial convenience considerations require that severance be denied.

In this case, the Government has alleged in its responses to defendants' pretrial motions the connection it plans to establish between the personal income tax counts and the counts involving the Company's taxes and the connection between those counts that charge Serubo with personal income tax evasion and those that charge Plachter with the same offenses. The apparent theory of the government's case is that defendants conspired to and did evade payment of the Company's taxes by deducting as business expenses the personal expenses of defendants Serubo and Plachter who, in turn, did not report the Company's payment of these expenses as personal income. In its response to the severance motions, the Government states:

"The alleged evasion of the corporate income taxes by Serubo and Plachter is directly linked to the evasion of the personal income taxes by the same individuals. Serubo and Plachter received a double benefit from the corporate payment for their personal goods and services. They directly benefited in that they did not have to use any personal monies for payment of the goods and services; they indirectly benefited in that corporate payments for the goods and services were deducted on the corporate tax returns, thereby reducing the tax liability of the Cadillac Company of which Serubo and Plachter were 91% stockholders. The connection between the corporate tax and personal tax evasion is the corporate activity of the defendants, particularly the disbursement of the corporate checks representing payment to vendors for goods and services received by the defendant Serubo or Plachter. These check payments were entered in the corporate books either in business expense accounts in the case of the purchase of an item such as Serubo's piano, or the asset accounts in the case of the purchase of an item such as Plachter's home security system. At the time of the computation of the corporate tax liability, these 'business expenses' along with the depreciation on the asset items, were subtracted from the corporation's gross income, thereby reducing the amount of corporate taxable income and corporate tax liability. The Government contends that the corporate check payments were never business deductions but actually represented dividends to defendants Serubo and Plachter and therefore not deductible by the cor-

poration from its corporate gross income. Conversely, as constructive dividends, they should have been reported by Serubo or Plachter but allegedly were not . . . The Government will prove a chain of events beginning with a defendant's receipt of a particular good or service, its payment by the corporation through a corporate check, and the entry of the corporate check in the books and records of the company. These sequential events coalesce the proof of the personal and corporate tax charges."

The government further alleges in the same responsive brief that Brown, as controller of the corporation, was responsible for hiding the personal expenses in the corporate books.

█ The Court finds that the connection alleged between the various counts is sufficient under Rule 8. This is an indictment involving various defendants and therefore, both the joinder of offenses and defendants must be tested under Rule 8(b). *United States v. Somers,* 496 F.2d 723 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). The issue, then, is whether the government alleges that the defendants "participated in the same act or transaction or in the same series of acts or transactions constituting an offense." To satisfy Rule 8(b)'s requirements, "it must only be shown that each act or transaction was part of a 'series of acts or transactions' and that each defendant participated in the series of transaction," *United States v. Laca,* 499 F.2d 922 (5th Cir. 1974); joinder does not require the participation by all defendants in every act constituting each joined offense. *United States v. Roselli,* 432 F.2d 879 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). Clearly, the government claims that the alleged evasion of personal income tax by Serubo and Plachter was part of a series of transactions that involved and flowed from the evasion of the Company's taxes and that all defendants participated in this series. This case is similar to and consistent with other cases where the government has joined in a multi-defendant indictment counts charging personal income tax of-

fenses with those that allege offenses arising from the manner in which the unreported income was obtained. *See, e. g., United States v. Roselli, supra; United States v. Beasley,* 519 F.2d 233 (5th Cir. 1975), *vacated on other grounds,* 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). As Rule 8(b) does not require that each defendant be named in every count and as the offenses charged are apparently factually related, *United States v. Gimelstob,* 475 F.2d 157 (3d Cir. 1973), the motions to sever under Rule 8(b) must be denied.

█ Defendants' motions to sever under Rule 14 are addressed to the discretion of the Court and turn upon a showing of prejudice.

*Rule 14. Relief from Prejudicial Joinder.* If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election of separate trial of counts, grant a severance of defendants or provide whatever other relief justice requires.

. . .

At this time, the Court finds insufficient basis upon which to grant defendants' motions.

█ Although defendants claim that the joint trial of this thirteen-count indictment may prejudice them as evidence may be admitted to prove one count which would be inadmissible to prove another, this is not an adequate reason to sever the indictment. *United States v. Kenny,* 462 F.2d 1205 (3d Cir. 1972). Nor should, as defendants contend, an indictment be severed because the case appears complex. The improper question is whether the jury can "reasonably be expected to compartmentalize the evidence as it relates to the separate defendants in view of its volume and limited admissibility." *United States v. Borish, supra.* In this case, even though the evidence promises to be extensive, the

Court expects it to be presented in a cogent fashion and will advise the jury through its instructions as to the manner in which the evidence can be used; therefore, the Court believes that the jury will be able to compartmentalize the evidence and consider it for its proper purposes. *United States v. Dansker,* 537 F.2d 40 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). And while Plachter and Brown may be correct in their claims that more damaging evidence will be presented against Serubo than against them, it is the law in this circuit that a "defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." *United States v. Somers, supra,* 496 F.2d at 730. The possibility of "guilt by association" does not generally afford a ground for severance. *United States v. Frumento,* 409 F.Supp. 143 (E.D.Pa.1976). Nonetheless, the Court recognizes its duty to insure a fair trial for the defendants and it will continue to scrutinize the proceedings for evidence of actual prejudice; if such evidence appears and a fair trial is threatened, the Court will consider severance. Therefore, defendants are given leave to renew their motions for severance at trial.

## ON MOTIONS TO DISMISS AND TO SUPPRESS EVIDENCE

In this criminal tax evasion case, a number of motions to dismiss the indictment and suppress the evidence have been presented to the Court; all three defendants join in each other's motions. The motions raise various claims and an evidentiary hearing was held to determine their validity. At the hearing, defendants were given an opportunity to present evidence in support of the allegations made in their motions. Each of the defendants' claims and the Court's findings as to the facts and law involved will be discussed below. In summary, the Court has decided to deny the motions.

*Internal Revenue Summonses*

Thirty five summonses were issued by the Internal Revenue Service (IRS) during the course of its investigation. Defendants assert that these summonses were not issued in good faith and, therefore, that the indictment should be dismissed or the fruits of the summonses suppressed. Whether a summons is issued in good faith and is proper turns upon the facts surrounding its issuance. After hearing the evidence, the Court finds that the following facts are relevant to this issue.

Shortly before June, 1974, Special Agent Richard F. Gilbert of the IRS Intelligence Division in Philadelphia received from the Federal Drug Enforcement Agency and the Organized Crime Unit of the Philadelphia Police Department information concerning defendant Peter J. Serubo. The information contained allegations respecting Serubo's involvement in loansharking and narcotic trafficking. Apparently, the information was transmitted to Gilbert because he was in the Narcotics Group of the Intelligence Division. A confidential informant, who had spoken with the FBI on a previous occasion, also gave Agent Gilbert information that related to Serubo. Gilbert did not have any contacts with the United States Attorney's office concerning Serubo at that time.

After evaluating the information received from these sources, Gilbert decided to seek IRS authorization to commence a joint civil and criminal tax investigation of Serubo. According to Gilbert the reason for the investigation was:

". . . to determine if these allegations were in fact true and if they were true, were there any monies received from these activities and were these monies reported for tax purposes to the Government." N.T. 1–8.

He wanted to know if Serubo received any income from alleged loansharking and narcotic activities that had not been reported to the IRS.

Through his supervisor, authorization for the investigation was sought from the internal committee of the IRS in Washington,

D. C., which devoted its resources to tax investigations of alleged narcotic traffickers who perhaps profited from such activity and did not report that profit to the Government. The committee's goal was to speed the investigation process, so that indictment and/or other legal action in these cases might be taken more quickly than otherwise possible. The fact that the Serubo investigation was requested by the Intelligence Division—the criminal division of the IRS—rather than the civil division does not appear unusual; Agent Gilbert testified that the Intelligence Division instigates more than fifty percent of IRS tax investigations.

On June 6, 1974, committee authorization for a joint civil-criminal tax investigation was received in the Philadelphia office, and on June 19, 1974, Agent Gilbert was actually assigned to the investigation and the investigation commenced. At that time, Revenue Agent Louis Berkowitz was also assigned to the investigation; he was later replaced by Revenue Agent Edward Marsh. Agent Gilbert was responsible for the criminal aspects of the tax investigation and Agent Berkowitz—and later Agent Marsh—was responsible for determining civil liability. Agent Gilbert testified, and the Court finds no reason to believe otherwise, that the investigation was conducted as a joint investigation with equal participation by the revenue agent and the intelligence agent.

· The investigation that followed can be divided into two phases. During the first phase, from June 19, 1974, to April 23, 1975, it appears that the tax investigation was conducted solely by the IRS agents. Twenty two summonses to various third parties were issued by the agents during this period; the first was issued on October 31, 1974, and the last on April 17, 1975. Agent Gilbert testified that these summonses were issued to aid in determining the criminal and civil tax liability of Serubo. He also stated that at that time he did not discuss the case with the Drug Enforcement Agen-

cy, the Philadelphia Police Department or the FBI.

But in April, 1975, the character of the investigation changed, and other federal agencies became involved. Joel M. Friedman assumed responsibility as the attorney in charge of the Philadelphia Strike Force in the summer of 1974 and started to review the files in his office to identify those persons who might be involved in organized criminal activities.[1] While reviewing these files, he became aware of certain allegations that had been made about the Plachter Serubo Cadillac Company (Company) and its principals. To determine whether the IRS was investigating and obtaining information relevant to these subjects, Friedman requested the Department of Justice to seek disclosure from the IRS of any information they might have acquired; he did not know that IRS had authorized an investigation. The disclosure authorization was received by IRS in Philadelphia on April 3, 1975.

Disclosure was actually made on April 23, 1975, at a meeting of Friedman, an FBI agent and an IRS agent at the Strike Force's offices. On April 29, 1975, another meeting was held where it became apparent, if it had not been made evident at the earlier meeting, that the FBI, the IRS and the Strike Force would coordinate their investigations of Serubo and to a certain extent the investigations would be unified under the leadership of a Strike Force attorney. As Mr. Friedman explained, from April 29th, it was understood that the participants in the investigations—the IRS, FBI and Strike Force, ". . . would approach [the investigation] with the idea of sharing the allegations and information that was derived from the investigation and that [they] would approach it jointly." N.T. 1–205.

That understanding became reality. The IRS continued its civil and criminal tax investigation, but its agents also participated in the Strike Force's coordinated inquiry. For example, on two occasions Don-

1. The Strike Force is a unit of the Justice Department's criminal division and it emphasizes prosecutions in the areas of organized crime and racketeering.

ald Brown was interviewed by both FBI Agent Pino and IRS Special Agent Donald Watkins; Agent Watkins replaced Agent Gilbert in the Serubo investigation in July, 1975. The Strike Force came to enlist the aid of the Grand Jury in June, 1975, and, upon the suggestion of Agent Gilbert, a grand jury subpoena was served on Donald Brown on June 9, 1975. After that time, the Grand Jury and the federal agencies continued their investigations. Finally, on January 27, 1977, Special Agent Watkins recommended criminal prosecution to the IRS regional counsel and an IRS formal recommendation was submitted to the Justice Department on November 9, 1977.

During this second phase of the investigation, Agents Gilbert and Watkins issued twelve IRS summonses to third parties. The first was issued on June 10, 1975, and the last on January 22, 1976. Watkins testified that none of the information received pursuant to these summonses was presented to the Grand Juries and none will be used at the forthcoming trial of this indictment. The Government has made similar representations in its brief in opposition to defendants' motions.

 The legality of the summonses must be tested under the standards set forth in the recent decision of *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978).[2] In *LaSalle*, the Supreme Court held that in a judicial proceeding brought to enforce a summons issued by the IRS under 26 U.S.C. § 7602,[3] the courts should only enforce the summons if it was issued before the IRS

recommended criminal prosecution to the Department of Justice and if the IRS issued the summons in "good faith pursuit of the congressionally authorized purposes of § 7602." *Id.* at 318, 98 S.Ct. at 2368, 57 L.Ed.2d at 236.

 In this case, clearly all the summonses were issued before the IRS recommended prosecution to the Justice Department on November 9, 1977. The question then is whether these summonses were issued in good faith by the IRS. It should be noted that although the question is phrased in terms of "good faith," it is the defendants' burden to show that the summonses were issued in "bad faith." As the Court recognized in *LaSalle*, this is a heavy burden to carry and one which defendants rarely meet. And yet, in order to prevent abuse by the IRS of their statutory investigatory power, the Court will look carefully at the circumstances surrounding the issuance of the summonses to determine whether defendants have carried their burden.

Bad faith can be demonstrated in a number of ways. If the IRS, as an institution, issues a summons when it is pursuing solely a criminal investigation, the summons is issued in bad faith. *United States v. LaSalle, supra*. Similarly, a summons served for the purpose of harassing the taxpayer or putting pressure on him to settle a collateral dispute is issued in bad faith. *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). And as explained in *LaSalle*, a delay in recommending prosecution to the Department of Justice to allow

**2.** In its most recent opinion in *United States v. Genser*, 582 F.2d 292 (3d Cir., filed August 29, 1978), the Court of Appeals confirmed that defendants have standing to challenge in the criminal proceedings the legality of summonses issued to third parties.

**3.** Section 7602 reads, in pertinent part: "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is

authorized—. . . (2) To summon the person liable for tax or required to perform or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry . . . ."

the IRS to gather additional evidence for the Department is improper, as is the IRS's assumption of an information-gathering role for other departments of the government.

Addressing, then, the propriety of the summonses issued during the first phase of the IRS investigation, the Court finds that defendants have not demonstrated that these summonses were issued in bad faith. It is clear to the Court that the IRS, as an institution, had both civil and criminal purposes in mind when it authorized the investigation into Serubo's tax affairs, as shown by the appointment of both revenue and intelligence agents to the investigation. Although the catalyst for the investigation was the allegations of loansharking and narcotic trafficking, this does not mean that the IRS was pursuing solely a criminal tax investigation. In *LaSalle* the tax investigation was also instigated because the IRS special agent had received from the FBI, the United States Attorney, the Secret Service and others, information about the subject of the investigation, and, yet, the Supreme Court found that the facts before it did not necessarily indicate that the IRS abdicated its civil inquiry in the case. Because of other possible criminal conduct, the IRS may have been more interested in this case than in others in pursuing the criminal investigation; yet, the presence of the revenue agent indicates that the IRS was also concerned with determining Serubo's civil liability.

Defendants strenuously contend that the IRS acted as an information-gathering agency for other federal agencies and conducted an investigation into Serubo's alleged non-tax criminal activities, and not into his tax affairs. The Court cannot accept defendants' theory. Agent Gilbert testified that although he received information from the Federal Drug Enforcement Agency and the Philadelphia Police Department, as well as from a confidential informant, information discovered during his investigation was not disclosed to the Drug Enforcement Agency. Moreover, the information gathered during his investigation was not revealed to the Strike Force until April, 1975, when IRS disclosure authorization was received. It is significant that when Friedman requested the information concerning Serubo from the IRS, he did not know that an IRS investigation was underway; his was only a general inquiry. The evidence reveals no pre or first phase arrangement between the IRS and any other federal investigative or prosecutorial agency to share information or conduct a joint investigation. Even though the investigation was authorized by an IRS committee which was concerned with narcotic traffickers, this does not lead the Court to conclude that the inquiry was pursued for the purpose of prosecuting Serubo for illegal narcotic activities; rather it indicates a commitment by the IRS to investigate the tax implications of such alleged conduct, a purpose squarely within those enumerated in Section 7602. From the evidence presented, bad faith cannot be found during the first phase.

Defendants argue that if the Government was ordered to produce internal government memoranda and records relating to this investigation, evidence of bad faith might be revealed. The Court previously denied defendants' request for this information, because it could not require disclosure of privileged internal government documents on the basis of such speculation. In its Order of July 12, 1978, this Court ruled that before defendants' request for these documents would be granted, they would be required to make a colorable showing of "bad faith" under *LaSalle.* Such a showing is necessary for otherwise all defendants need do is raise a claim of bad faith, and the Government would be forced to open its files to them. *See United States v. Berrigan,* 482 F.2d 171 (3d Cir. 1973); *United States v. Oaks,* 508 F.2d 1403 (9th Cir. 1974), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). From the evidence elicited at the hearing, and for the reasons stated with regard to their main claim, the Court must conclude that defendants have not satisfied the requirements for disclosure as the evidence does not indicate that during the first phase of this investiga-

tion the summonses were issued in "bad faith."

Turning to the second phase of the tax investigation, the evidence of bad faith is considerably stronger. Although the civil tax investigation continued, the IRS may have assumed an impermissible information-gathering role for the Strike Force, the FBI and the Grand Juries after it disclosed the fruits of its investigation to the Strike Force *and* joined the Strike Force in its investigation of Serubo. As Mr. Friedman testified, not only were the FBI, Strike Force and IRS investigations coordinated, but the information that these agencies received in their separate investigations, including that obtained through summonses, was shared. The reasons why it would appear impermissible to issue IRS summonses at a time when the IRS was engaged in such an arrangement with other federal agencies can be understood by reviewing the policy considerations underlying the prophylactic rule against issuing summonses after the IRS refers a tax case to the Justice Department for prosecution. In *La-Salle,* even though the Supreme Court acknowledged that a civil investigation which proceeds at the same time that a case is referred for prosecution might benefit by the use of IRS summonses, it recognized that two considerations required denying IRS the summons power at that time. First, the Court found that permitting the IRS to issue summonses would inevitably enlarge the prosecution's discovery rights, since the IRS would likely share the fruits of the summonses with the prosecution. Secondly, as the grand jury investigates and accuses in a criminal case, allowing the IRS to issue summonses at a time when the grand jury would otherwise issue subpoenas would infringe on the grand jury process. Neither broadening criminal discovery rights of the prosecution nor encroaching upon the grand jury's role is an intended purpose of the congressional grant of summons power to the IRS and, therefore, the Supreme Court found that the prophylactic rule was necessary. In this case, admittedly the Strike Force's discovery rights were enlarged by use of the IRS summons; the

information received through the IRS summonses and revealed to the Strike Force would otherwise have been available only through grand jury subpoenas or search warrants. And, as the summonses were issued at a time when the Grand Juries were acting in this case, they infringed upon the Grand Juries' investigative role. Even though the civil investigation might have been advanced by use of IRS summonses, it would appear that issuing them during phase two of the investigation caused the IRS to engage in impermissible information-gathering for the other governmental bodies.

Although the Court would be inclined to hold that the summonses dated after April 25, 1975, were issued in bad faith and therefore to suppress the evidence derived from them, it is not necessary to do so. As Agent Watkins has testified and the Government attorney has indicated, none of the evidence obtained as a result of these summonses was presented to the Grand Juries and none will be presented at trial. Therefore, there is no evidence to suppress and the issue is moot. Defendants have asked the Court to dismiss the indictment if it finds that the summonses were issued in bad faith. The Court cannot grant this request. If none of the evidence obtained as a result of these summonses was presented to the Grand Juries, and none will be presented at trial, there is no basis for dismissing the indictment. *United States v. DiFronzo,* 345 F.2d 383 (7th Cir.), *cert. denied,* 382 U.S. 829, 86 S.Ct. 67, 15 L.Ed.2d 74 (1965); *United States v. D'Angiolillo,* 340 F.2d 453 (2nd Cir.), *cert. denied,* 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965). As the Supreme Court has instructed, " . . . the penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve," *United States v. Ceccolini,* 435 U.S 268, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978); dismissal of the indictment would serve no legitimate purpose here.

*Donald Brown's Briefcase*

Seeking to suppress the contents of a briefcase which was subpoenaed by the Grand Jury, Defendant Donald Brown alleges that on June 9, 1975, FBI agents came to the Company's offices for the purpose of causing him to surrender a briefcase and that when he did not consent to surrendering the briefcase, he was required to accompany them to the Grand Jury where his briefcase was opened without his consent. He claims that he was arrested and seized without a warrant in violation of the Fourth Amendment and that he was denied the right to counsel in violation of the Fifth Amendment. His motion on all grounds is meritless.

■ Although given an opportunity to develop the facts alleged at the evidentiary hearing, Brown called no witnesses in support of his motion. The only relevant testimony was given by Agent Gilbert. Gilbert stated that he served the subpoena on Brown, accompanied him to the courthouse in Brown's car, and upon arriving at the courthouse, went to Judge Becker's chambers where Brown's attorney, Donald Goldberg, was present. The briefcase was opened in Judge Becker's chambers in the presence of Mr. Goldberg. From these facts, the Court finds no violation of defendant Brown's rights; it was Brown's burden to come forward with evidence in support of his motion, and he failed to do so.

*Pre-Indictment Delay*

Defendants move to dismiss the indictment on grounds of pre-indictment delay. As discussed earlier, the IRS commenced this investigation in June, 1974, and the Grand Juries became involved in it in June, 1975; the case was officially referred for prosecution to the Justice Department on November 9, 1977, and the indictment was returned on March 13, 1978.

■ A substantial period of time elapsed between the beginning of this investigation and the indictment; nonetheless, defendants have not established

grounds for granting their motions. The claim of pre-indictment delay is one raised under the Due Process Clause of the Fifth Amendment and the proof required is an actual demonstration that substantial prejudice has resulted from pre-indictment delay. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). No evidence on this issue was presented at the evidentiary hearing and in their briefs defendants merely allege that they would be prejudiced by a trial at this time because memories have faded; these allegations are insufficient to satisfy defendants' burden. *United States v. Marion, supra; United States v. Dukow,* 453 F.2d 1328 (3d Cir. 1972). And even if they established actual prejudice, the motions could not be granted because dismissal based on pre-indictment delay requires defendants to also show that the reasons for the delay were impermissible. *United States v. Lovasco, supra.* That showing has not been made here.

*Grand Jury Abuse and Irregularities*

■ Two grand juries investigated this case. Chief Judge Joseph S. Lord, III, pursuant to 18 U.S.C. § 3331, impaneled the first special grand jury on February 19, 1976. At the completion of its service, a second special grand jury that had been convened on August 23, 1976, by Judge Lord and also under the authority of 18 U.S.C. § 3331, continued the investigation. In their motions, defendants allege that the Grand Juries were abused and that there were irregularities in the procedures followed before and by them; and yet, during the evidentiary hearing, again evidence was not presented to buttress these claims.

A presumption of regularity attaches to the actions of both the grand jury and its advisors and a party attacking them has the burden of clearly proving otherwise. *Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972). Although defendants claim that the government attorneys and agents engaged in behavior which made it impossible for the Grand Juries to deliberate fairly, they

made no factual showing in support of their claim. Similarly, the allegations that unauthorized persons were present during the Grand Juries' proceedings remain bare. Clearly, the presumption of regularity is not overcome in either instance.

■ Defendants also contend that documents that were the subject of the Grand Juries' deliberations were disclosed without authorization. From Agent Gilbert's testimony, it is apparent that he saw documents subpoenaed from Brown prior to the time when Judge Edward Becker entered an Order under Rule 6(e) of the Federal Rules of Criminal Procedure permitting IRS agents to assist in the grand jury investigation and to be given access to books, records, documents and other materials subpoenaed before the Grand Juries. Nevertheless, such disclosure appears proper under Rule 6(e)(2)(A)(ii) which allows disclosure of such information to " . . . such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce Federal criminal law." Agent Gilbert, who was assisting the Strike Force attorney, qualifies under this definition. Defendants further question the validity of the 6(e) Order entered by Judge Becker, but do not state their reasons for doing so. The Court will summarily deny the motion on this ground, as the Order appears entirely proper under Rule 6(e).

■ Defendants' final challenge to the Grand Juries' actions relates to the scope of their investigations; defendants contend that the Grand Juries' investigative powers did not include possible violations of the Internal Revenue Code. Clearly, this is not the case. Both grand juries were impaneled pursuant to 18 U.S.C. § 3331, and were authorized to investigate offenses against the criminal laws of the United States. 18 U.S.C. § 3332. Surely, there can be no doubt that the offenses charged in this indictment, although tax offenses, are criminal offenses within the proper scope of the investigating and indicting grand juries.

## Prosecutorial Abuse

■ The government attorneys and agents have been charged by defendants with prosecutorial misconduct. Defendants allege that the Government engaged in a "sheer fishing expedition," selecting these defendants for investigation and prosecution by means of an invidiously discriminatory process. While the Court would conduct a serious inquiry into these charges if defendants supported them with evidence of selection for prosecution on an impermissible basis, there is no reason to inquire further as defendants have not even explained the basis for these claims in their briefs. Nor does defendants' contention that the prosecution misused the grand jury process in an attempt to extort from Brown and Serubo information about organized crime merit additional attention; defendants were given the opportunity to present evidence on this issue and failed to do so. Bare allegations will not overcome the presumption that prosecutions are undertaken in good faith pursuit of seeking out offenders of the criminal law. *United States v. Bennett,* 539 F.2d 45, *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976); *United States v. Falk,* 479 F.2d 616 (7th Cir. 1973).

## Miscellaneous Allegations

In their motions, defendants made several additional allegations but never developed them at the evidentiary hearing. The Court will briefly review these claims to insure that there has not been abuse of pretrial processes.

■ First, defendants claim that the IRS failed to follow its procedures of affording defendants a conference with the IRS prior to the case's submission to the Justice Department for prosecution. Defendants have not established that they were denied a meeting with the IRS, and, in fact, the Government contends that the opportunity to speak with the IRS was afforded to them. Moreover, even if they were not given this opportunity to confer, defendants have not presented any authority

for dismissing an indictment for failure to follow an internal IRS procedure.

As noted in the discussion of IRS summonses, a confidential informant supplied information to Agent Gilbert about Serubo. Defendants contend that the informant's involvement with this investigation so tainted it that dismissal of the indictment is required. Their argument rests on a recent decision by Judge Herbert A. Fogel in *United States v. Cortese,* 448 F.Supp. 845 (E.D. Pa., 1978). The *Cortese* decision is distinguishable from and no authority for this case. In *Cortese,* Judge Fogel refused to enforce an IRS summons that had been issued to the Prothonotary of the Philadelphia County Court of Common Pleas. After an *in camera* examination of the confidential informant who caused the IRS inquiry, he concluded that the informant's purpose in revealing information to the IRS was solely one of retribution against the subjects of the investigation; this purpose, and no other, had become "inextricably intertwined with the IRS investigation." *Id.* at 851. In this case, although there has been no *in camera* examination of the informant, such a finding cannot be made. An indictment has been brought against these defendants charging them with tax offenses and therefore, there is an obvious tax purpose to the investigation. Additionally, the information apparently supplied by the informant and from other sources dealt with loansharking and narcotic trafficking—activities in which income might be produced and go unreported; it would seem that such information would naturally trigger a tax investigation. In *Cortese,* this was not the case. Therefore, the motion to dismiss based upon the use of the confidential informant must be denied.

■ Dismissal of the indictment, defendants claim, is also required because the indictment and the statutes underlying the indictment are vague and ambiguous and do not apprise defendants of the crimes with which they are charged. No authority is given to support their claim, and the Court has not been able to find any in other sources. In fact, the statutes under which defendants were indicted—26 U.S.C. §§ 7201, 7206(2) and 18 U.S.C. § 371—have withstood constitutional challenges on vagueness grounds. *See, e. g., United States v. Chikata,* 427 F.2d 385 (9th Cir. 1970); *United States v. Heck,* 499 F.2d 778 (9th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974).

■ The last challenge is to the grand jury subpoenas that were issued in this case. Defendants contend that the Government has not shown that every item sought by each grand jury subpoena was relevant to the investigation, properly within the Grand Juries' jurisdiction and not sought primarily for another purpose; for this alleged misconduct they argue that the only appropriate remedy is suppressing the evidence derived from the subpoenas. Apparently, their claim is founded on *In re Grand Jury Proceedings,* 486 F.2d 85 (3d Cir. 1973) (*Schofield I*), wherein the Court held that when the Government requests judicial enforcement of a grand jury subpoena, it must provide an affidavit which states that each item is relevant to an investigation being conducted by the grand jury and properly within its jurisdiction and is not sought primarily for another purpose. *See also In re Grand Jury Proceedings,* 507 F.2d 963 (3d Cir. 1975) (*Schofield II*). Defendants seek to apply the *Schofield* requirements to this case and require the Government to make the *Schofield* showing at this time. Such retroactive application of these requirements is improper. Although the Court of Appeals has not directly addressed this issue, this Court cannot accept that its *Schofield* decisions mandate such a result. The affidavit requirement in *Schofield* was imposed because the Government requested that a court enforce a grand jury subpoena; before a court could agree to such enforcement, the Court of Appeals sought assurance that the subpoena was employed for legitimate purposes. A court cannot sanction the use of a grand jury subpoena if its purpose is not to aid a legitimate criminal investigation, but only to harass an individual. As there is no assurance when a subpoena is issued by a grand jury that its

fruits actually will be used in a criminal prosecution, an affidavit provides minimal assurance that the subpoena is being used legitimately. The posture of this case is different than the enforcement proceeding in the *Schofield* cases. Here defendants wish to suppress evidence which the Government intends to use at trial merely because it is fruits of subpoenas issued during the grand jury process. The mere fact that the Government intends to use the evidence obtained from the contested subpoenas gives the Court the same minimal assurance provided by the *Schofield* affidavit that the subpoenas were issued in good faith and not in abuse of the grand jury process. Therefore, failure to make the *Schofield* showing at this time does not require dismissal of the indictment.

The Court will enter an order in accordance with this memorandum denying defendants' motions.