UNITED STATES of America, Appellee,

v.

Peter J. SERUBO, Donald H. Brown, Appellants.

UNITED STATES of America, Appellee,

v.

W. Thomas PLACHTER, Jr., Appellant.

Nos. 78–2505 to 78–2507.

United States Court of Appeals, Third Circuit.

Argued June 6, 1979.

Decided Aug. 20, 1979.

As Amended Sept. 11, 1979.

Thomas B. Rutter (argued), Philadelphia, Pa., for appellant, Peter J. Serubo.

Thomas A. Masterson, Philadelphia, Pa., (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel; Kenneth J. Krupsky, Philadelphia, Pa., for appellant, W. Thomas Plachter, Jr.

Louis W. Fryman, Philadelphia, Pa., for appellant, Donald H. Brown.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Robert E. Lindsay, James A. Bruton (argued), Attys., Tax Div., Dept. of Justice, Washington, D.C., for appellee; Peter F. Vaira, Jr., U. S. Atty., Philadelphia, Pa., of counsel.

Before ALDISERT, GIBBONS and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

The defendants, Peter J. Serubo, Donald H. Brown and W. Thomas Plachter, Jr., appeal from judgments of sentence following their pleas of guilty to criminal violations of the internal revenue laws. Those guilty pleas were, as authorized by *United States v. Zudick,* 523 F.2d 848, 851–52 (3d Cir. 1975), and *United States v. Moskow,* 588 F.2d 882, 886 (3d Cir. 1978), conditioned upon their retention of the right to appeal from the trial court's denial of several pretrial motions, and the government does not contest appellate jurisdiction under 28 U.S.C. § 1291. The pretrial rulings challenged on appeal dealt with motions addressed to alleged abuses of the Internal Revenue Service's (IRS) civil subpoena power, claimed prosecutorial misconduct before the grand jury, a change of venue because of prejudicial pretrial publicity, and severance of personal and corporate income tax charges. We conclude that a remand for further proceedings is required.

## I. FACTS AND PROCEEDINGS BELOW

### A. *Nature of the Charges*

Summarized, the indictment, which was returned on March 13, 1978, deals with the tax liability, for the years 1971 through 1973, of the Plachter-Serubo Cadillac Company, an incorporated automobile dealership (the Corporation) and the individual tax liability, for the same years, of two of its controlling stockholders. It charges that Plachter and Serubo, the Corporation's officers and controlling stockholders, and Brown, employed by the Corporation as Comptroller, conspired to cause personal expenditures to be made on behalf of Plachter

and Serubo, while deducting those expenditures, falsely labeled business expenditures, on the corporate tax returns. Serubo and Plachter are also charged with failing to report the expenditures as income to them on their personal income tax returns.

### B. *Pre-Sentence Proceedings*

Following the return of the indictment the defendants, with the aid of materials obtained in discovery permitted by the trial court, moved to dismiss the indictments, or suppress evidence, charging (1) that the IRS had used its civil summons power in bad faith to conduct a criminal investigation; and (2) that the prosecutor had abused the grand jury procedure. They also moved for a severance on the ground that the indictment joined unrelated offenses in violation of Fed.R.Crim.P. 8(b). Plachter and Serubo moved for a change of venue because of prejudicial pretrial publicity. Finally, Plachter moved for additional discovery bearing upon the IRS summons issue. The trial court denied these motions in three pretrial opinions. *United States v. Serubo,* 460 F.Supp. 689 (E.D.Pa.1978).

On September 5, 1978, the day the trial was to commence, the defendants, by this time in possession of transcripts of grand jury proceedings furnished pursuant to a *Brady* request, moved for reconsideration of the motion to dismiss the indictment because of prosecutorial misconduct. Although the court found prosecutorial conduct which was "generally improper, reprehensible and unacceptable," the motion for reconsideration was denied. Plachter and Brown then entered a *Zudick* plea. Serubo went to trial, but before the case went to the jury he also entered a *Zudick* plea. Thereafter the defendants made post-trial motions for reconsideration of the pretrial denial of the motion for additional discovery on the IRS summons issue and a new motion for further discovery on the abuse of the grand jury procedure. Both the motion for reconsideration and the new motion were denied, and judgments of sentence entered. This appeal followed.

## II. THE *GENSER* CLAIM

### A. *The Pre-indictment Investigation*

Although the defendants contend that they need additional discovery in order fully to present their case respecting the alleged abuse of the IRS civil subpoena power, many of the facts respecting the pre-indictment investigation were developed in an evidentiary hearing and found by the trial court. That investigation can, for purposes of this appeal, be divided into two phases: (1) April 1974 to April 23, 1975; and (2) April 23, 1975 to January 22, 1976, the date when the last IRS summons was issued.

#### 1. *Phase I*

In April of 1974 Special Agent Richard T. Gilbert, assigned to the narcotics group of the Intelligence Division of the IRS in Philadelphia, received from the Federal Drug Enforcement Administration (DEA) and the Organized Crime Unit of the Philadelphia Police Department information suggesting that Serubo was involved in loansharking and in financing of narcotics transactions, and was linked with organized crime. About the same time Gilbert received from an unnamed confidential informant of the Federal Bureau of Investigation (FBI) similar allegations about Serubo. After evaluating the information, and without communicating with the United States Attorney, Gilbert sought authorization from the IRS National Office to conduct a joint civil and criminal investigation of Serubo, to determine if the allegations of loansharking and narcotics trafficking were true, and if so, whether the proceeds of these activities had been reported to the government for tax purposes. An IRS internal committee in Washington, D.C., concerned with expediting the investigation of income tax liability of narcotics traffickers, considered Gilbert's request, and on June 6, 1974, authorized a joint civil-criminal investigation of Serubo.

Revenue Agent Louis Berkowitz and Special Agent Gilbert were assigned to the case on June 19, 1974. Berkowitz was replaced, in September 1974, by Revenue Agent Edward Marsh. At least in Phase I, the investigation was conducted by Gilbert and the

two revenue agents as a joint civil-criminal investigation, with equal participation by the revenue agents and the special agent. Between June 19, 1974 and April 23, 1975, Gilbert, pursuant to 26 U.S.C. § 7602, issued twenty-two administrative subpoenas to various third parties seeking information bearing upon Serubo's tax liability. During that period Gilbert had not formed a commitment to recommend prosecution under the internal revenue laws, and did not transmit any of the evidence obtained by use of the subpoenas to the DEA, the FBI, the United States Attorney, or the Philadelphia Police Department. No evidence was introduced with respect to Phase I suggesting an abandonment of a civil purpose, or an unexplained delay, after a decision to recommend prosecution, used as a subterfuge for a continued investigation. Later, evidence obtained by use of IRS subpoenas issued during the first phase of the investigation was presented to the grand jury, and was intended to be used by the government at defendants' trial.

### 2. *Phase II*

In November of 1974 Joel M. Friedman, an attorney in charge of the Philadelphia Office of the Organized Crime and Racketeering Section of the Justice Department (Philadelphia Strike Force) learned, during a review of Strike Force files, of a 1973 FBI report suggesting that the Plachter-Serubo Cadillac dealership had been infiltrated by organized crime. The Strike Force was then unaware of the IRS investigation. Friedman requested further investigation by the FBI and also asked the Department of Justice to seek disclosure from the IRS of any information it might have pertinent to the infiltration allegations. On April 3, 1975 the Philadelphia Office of the IRS was authorized to disclose to the Strike Force information concerning its Serubo income tax investigation. Disclosure of information to the Strike Force began on April 23, 1975 at a conference between Friedman, representatives of the FBI, and representatives of the IRS. Thereafter the investigations of Serubo by the Department of Justice and the Treasury Department were coordinated under the leadership of a Strike Force attorney. FBI agents and IRS agents conducted joint interviews of Brown. IRS Special Agent Gilbert, in June of 1975, suggested the issuance of a grand jury subpoena to Brown for the contents of his briefcase, which was issued on June 9, 1975 and served by Gilbert. Shortly thereafter the district court granted the government's motion, pursuant to Fed.R.Crim.P. 6(e), for disclosure of grand jury matters to IRS personnel, who were assisting in the grand jury investigation. Between June 10, 1975, and January 22, 1976, Special Agent Gilbert and Special Agent Donald Watkins, who succeeded Gilbert in the Serubo investigation in July, 1975, issued thirteen administrative subpoenas to third parties. In October, 1975 Plachter became a target of the government's investigation, and in September, 1976, so did Brown. Although from April 23, 1975, the IRS Agents were participating in a Strike Force investigation, and from June 9, 1975, in a grand jury investigation, Agent Watkins did not recommend criminal prosecution until January 27, 1977, and the Regional Counsel of the IRS did not submit a formal recommendation of prosecution to the Department of Justice until November 9, 1977. Agent Watkins testified that none of the evidence obtained through the use of the thirteen administrative subpoenas used during the second phase was presented to the grand jury or would be used directly or indirectly to obtain evidence intended for use at trial.

### B. *The District Court's Decision*

Reviewing this record in light of the standards announced in *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the district court concluded that the defendants had failed to make even a colorable showing that the twenty-two subpoenas issued during Phase I of the investigation were issued in "bad faith." He therefore denied both the defendants' motions for further discovery regarding the first phase of the investigation, and their motion to suppress the evidence gathered in that phase. *United States v. Serubo,* 460 F.Supp. at 698–99. Regarding the thirteen subpoenas issued

during Phase II, the court stated that it would be "inclined to hold that the summonses dated after April 25, 1975, were issued in bad faith and therefore to suppress the evidence derived from them." Id. at 699. It found it unnecessary to do so, however, because it credited Agent Watkins' testimony that none of the evidence obtained as a result of the Phase II subpoenas was presented to the grand jury or was scheduled for presentation at trial. The court also denied the defendants' request to dismiss the indictment on the basis of abuse of the summons procedure.

### C. Discussion

#### 1. Standards Governing Use of Internal Revenue Service Subpoenas.

In United States v. Genser, 582 F.2d 292 (3d Cir. 1978) (Genser I), relying upon statements to that effect in Donaldson v. United States, 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), and United States v. Friedman, 532 F.2d 928, 931 (3d Cir. 1976), we held that a defendant in a criminal case could assert that evidence obtained pursuant to 26 U.S.C. § 7602 solely for a criminal rather than a civil investigative purpose was illegally obtained and should be suppressed. In this case we apply the standards for determining IRS compliance with section 7602 announced by the Supreme Court in United States v. LaSalle National Bank, 437 U.S. 298 (1978), as elaborated in the context of a suppression motion by an indicted defendant in United States v. Genser, 595 F.2d 146 (3d Cir. 1979) (Genser II ).

LaSalle National Bank, establishes two important limitations upon the validity of an IRS civil summons. First, the summons must be issued before the IRS recommends to the Justice Department that a criminal prosecution be undertaken. Second, prior to that date, the IRS "at all times must use the summons authority in good-faith pursuit of the congressionally authorized purposes of § 7602." 437 U.S. at 318, 98 S.Ct. at 2368. "[B]ad faith" abuse of the powers granted by section 7602 occurs when "the Service . . . abandon[s] in an institutional sense . . . the pursuit of civil

tax determination or collection." Id. Because the goals of determining liability for civil fraud penalties and determining the existence of a basis for criminal prosecution are "normally inseparable," id. at 314, 98 S.Ct. 2357, the party opposing the summons bears the "heavy" burden of disproving the "existence of a valid civil tax determination or collection purpose" on the part of the IRS. Id. at 316, 98 S.Ct. at 2367. The IRS "rarely will be found to have acted in bad faith" for pursuing solely criminal matters. Id.

The LaSalle Court specified two instances where bad faith might be shown. The Court refused to "countenance delay in submitting a recommendation to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather additional evidence for the prosecution," since "such a delay would be tantamount to the use of the summons authority after the recommendation . . . ." Id. at 316–17, 98 S.Ct. at 2368. Bad faith is also shown when the IRS becomes "an information-gathering agency for other departments, including the Department of Justice." Id. at 317, 98 S.Ct. at 2367, 2368.

Genser II places a further gloss on the LaSalle standards. There we held that the test of the validity of an IRS summons was not the existence of "a general civil purpose" for the investigation, but rather the purpose of the individual summons at issue. "If any one . . . [summons] . . . were issued solely for a criminal purpose, the fruits of that summons would have to be suppressed, even in the face of an overwhelmingly civil purpose of the investigation as a whole." 595 F.2d at 150. This standard, however, does not require "a district court to examine every summons issued in every investigation." Id. at 151. Since LaSalle requires institutional abandonment of a civil collection purpose, and since, under LaSalle, the intent of a single agent cannot be imputed to the institution as a whole, we reasoned that summonses issued by an investigating agent before that agent recommended prosecution would be

presumptively valid. But that presumption could be overcome by a showing that the agent had "issued summonses at the request of the United States Attorney or delayed his recommendation at the request of his superiors solely to further a criminal investigation." *Id.*

In *Genser II*, we placed the burden upon the defendant to overcome the presumption of validity attaching to prerecommendation subpoenas. At the same time, we recognized that the evidence needed to meet that burden was in the hands of the government. To give meaning to the suppression remedy, we established standards for discovery against the government:

> At a minimum, the taxpayer should be entitled to discover the identities of the investigating agents, the date the investigation began, the dates the agent or agents filed reports recommending prosecution, the date the district chief of the Intelligence Division or Criminal Investigation Division reviewed the recommendation, the date the Office of Regional Counsel referred the matter for prosecution, and the dates of all summonses issued under 26 U.S.C. § 7602. Furthermore, the taxpayer should be entitled to discover the nature of any contacts, relating to and during the investigation, between the investigating agents and officials of the Department of Justice.

Where this information or other evidence introduced by the taxpayer reveals (1) that the IRS issued summonses after the investigating agents recommended prosecution, (2) that inordinate and unexplained delays in the investigation transpired, and (3) that the investigating agents were in contact with the Department of Justice, the district court must allow the taxpayer to investigate further. In proper cases, this investigation could include the opportunity to examine the IRS agents or officials involved, or to discover documents. Such examination/discovery, however, should be carefully tailored to meet the purpose of the inquiry. On the other hand, where this information indicates that none of these three conditions are present, the district court need inquire no further.

*Id.* at 152.

■ Applying the standards of *Genser II* to this case, we conclude that the trial court's ruling with respect to the Phase I subpoenas can be approved, but that it was error to rule on the Phase II subpoenas without additional discovery.

The 22 subpoenas issued during Phase I were issued long before a decision respecting prosecution was made by the IRS, institutionally, or even by the agent in charge of the investigation. There is no evidence in this phase of unexplained delay as a subterfuge for a continued criminal investigation. Nor is there evidence of contact between the IRS and the Strike Force until the Strike Force initiated such contact in April, 1975. There is some evidence of contact between the IRS and the DEA, but the testimony of Agent Gilbert is that no evidence was passed on to that agency. The defendants object that the trial court did not make an individual determination as to the purpose of each of the 22 subpoenas. But for summonses issued prior to the agent's recommendation of prosecution *Genser II* does not require an individual determination. *See* 595 F.2d at 151. The defendants also point out that the recommendation of prosecution was delayed until 1977, two years after the issuance of the initial subpoenas. But the concern expressed in *Genser II* is not with delay itself, but with the issuance of subpoenas during a delay occurring after a decision has been made to recommend prosecution. In *Genser II* nine subpoenas issued after the special agent had completed his investigation and was preparing a report recommending prosecution. None of the 22 subpoenas issued in Phase I presents a similar issue. Finally, the defendants contend that they were entitled to additional documentary discovery to probe the credibility of the agents' testimony regarding the absence of a decision on prosecution and the absence of contacts between the IRS agents and prosecutorial agencies. While such discovery certainly would have been permissible un-

der *Genser II,* the trial court's conclusion that the information available in this record sufficed was not an abuse of discretion. The minimum discovery required by *Genser II* was satisfied, and if only Phase I was at issue we would not require further proceedings.

With respect to Phase II, however, the problem is quite different. After April 23, 1975, the IRS agents were acting under the supervision of a Strike Force attorney in an ongoing criminal investigation. It therefore appears that there was a real likelihood that the IRS was used "[as] an information-gathering agency for other departments," in violation of the *LaSalle* standard. 437 U.S. at 317, 98 S.Ct. at 2368. With respect to the 13 subpoenas issued during this phase, individual determinations of non-criminal purpose were clearly required. The trial court did not pursue that inquiry, however, and denied further discovery as well, because he accepted Agent Watkins' representation, fortified only by the government's brief, that none of the resulting information was used by the grand jury or as a lead to any information which would be used at trial. Thus the trial court's ruling assumed that there was a *Donaldson-LaSalle* violation, but accepted the agent's representation of absence of taint without affording the defendants access to the wherewithall to conduct an effective cross-examination. In *Genser I,* 582 F.2d at 310–11, we held that the government had the burden, after a *Donaldson-LaSalle* violation was established, of showing a "taint-free" basis for the evidence it relied on in the criminal prosecution. Certainly that burden cannot be met by an agent's unsupported conclusion. Even assuming the agent's utmost good faith, he may not be permitted to substitute what amounts to his legal conclusion for a meaningful judicial determination of taint made upon a fully developed record. The absence of discovery with respect to Phase II precluded that judicial determination. The defendants were entitled to discover what information was gathered as a result of the Phase II subpoenas, how the information was handled after it was gathered, and how it re-

lates to the information gathered during Phase I, which concededly was presented to the grand jury, and was intended for use at trial. A remand for this purpose is required. Moreover, since there may well be questions bearing on taint about the relationships between the Phase I information and the Phase II information, the trial court should reconsider the denial of discovery respecting Phase I as well.

### 2. *The Remedy if Taint is Found*

In *Genser II* the appellants before us had been convicted after a trial. In those circumstances we remanded for a reconsideration of the taint issue, retaining jurisdiction over the appeal for the obvious purpose of considering whether, if suppression were appropriate with respect to some of the evidence presented, a new trial might be necessary. In this case, because of the *Zudick* plea, there is only a partial trial record in Serubo's case, and none in the other cases. Thus the issue here is not whether the convictions are the result of tainted evidence, but whether suppression motions should have been granted. The difference in procedural posture requires a consideration of remedies.

The defendants moved both to suppress evidence obtained as a result of *Donaldson-LaSalle* violations and to quash the indictment. If after further proceedings the district court should conclude that such evidence obtained through IRS subpoenas issued during Phase II of the investigation was used by the government in obtaining the indictment or was likely to have been relied upon in a trial, all such evidence should, of course, be suppressed. At that point the defendants would, at the very least, be entitled to withdraw their guilty pleas and plead anew, after consideration of the strength of the government's case absent the suppressed evidence. Whether the additional relief of quashing the indictment should be granted is a more difficult question.

As Judge Biggs pointed out in *Genser I,* 582 F.2d at 308–09, we deal here with a statutory policy of confining Internal Reve-

nue Service subpoenas to non-criminal purposes. It is hardly a necessary interpretation of 26 U.S.C. § 7602 that it requires suppression of evidence not only at trial (an established remedy), but in a grand jury proceeding as well. In *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), the Supreme Court considering an analogous statutory policy embodied in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, held that a grand jury witness was entitled to refuse to answer questions based upon information seized in violation of that statute. But *Gelbard* expressly noted that even under Title III a defendant had no standing to contest the illegal provenance of evidence presented to the grand jury. The Court recognized the continuing authority of *United States v. Blue*, 384 U.S. 251, 84 S.Ct. 1416, 16 L.Ed.2d 510 (1966), *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), and *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), for the "general rule" that the quality of the evidence presented to the grand jury is not relevant to the validity of an indictment. 408 U.S. at 60, 92 S.Ct. 2357. The *Blue-Lawn-Costello* rule was reaffirmed in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), which held that the fourth amendment exclusionary rule does not apply to evidence presented to a grand jury. Given these authorities, we would have to find strong evidence of a Congressional intention to apply the suppression remedy in a grand jury context on account of a *Donaldson-LaSalle* violation. No such evidence has been called to our attention. Thus we conclude that if after discovery the defendants establish grounds for the suppression of evidence obtained as a result of issuance of the Phase II administrative subpoenas, the only relief to which they would be entitled is the opportunity to withdraw their guilty pleas and plead anew.

## III. PROSECUTORIAL MISCONDUCT BEFORE THE GRAND JURY

### A. *Facts and Proceedings Below*

Two grand juries were involved in the investigations which produced the March 13, 1978 indictment. The first was convened by Judge Fogel on February 19, 1975. Between June, 1975 and August, 1976, the Fogel grand jury conducted an extensive investigation into alleged criminal activities of the defendants. During this period it heard testimony from a number of witnesses. Questioning before the grand jury was conducted by Louis Pichini, an attorney associated with the Philadelphia Strike Force. The first grand jury did not return an indictment.

On August 23, 1976, upon the expiration of the term of the first grand jury, Judge VanArtsdalen convened a second special grand jury which continued the criminal tax investigation. On December 30, 1976, pursuant to Fed.R.Crim.P. 6(e), Judge Becker authorized the disclosure to the IRS of "books, records, documents and transcripts of testimony of witnesses subpoenaed before the" Fogel grand jury. At the same time, he authorized the transfer of "custody of all books, records, documents and materials . . . obtained by the February 19, 1975, grand jury" to the August 23, 1976, grand jury. A superseding Rule 6(e) order, issued on May 19, 1977, was framed in similar language. We are unable to determine, from these orders, whether transcripts of testimony before the first grand jury were transferred to the custody of, or were considered by, the second grand jury. The second grand jury returned the March 13, 1978 indictment against the defendants.

Pursuant to defendants' *Brady* requests, the government turned over to defense counsel transcripts of testimony of 32 of the 50 witnesses who testified before the first and second grand juries. The transcripts which have been made public disclose conduct by Mr. Pichini which the trial judge described, quite accurately, as "improper, reprehensible and unacceptable." 327a. Perhaps the most egregious example of this misconduct occurred during the testimony of Henry Brown, the brother of the defendant:

Q. Do you know Frank Sindone?

A. No.

Q. Have you ever heard the name Frank Sindone?

A. No.

Q. Do you know Frank Sindone is probably the number three man of the Philadelphia Cosa Nostra?

A. No.

Q. Do you know Frank Sindone was tried for loansharking in 1971?

A. No.

Q. Do you know that during the course of his loansharking case there were tapes played in open Court that he stated that in referring to someone that owed him money, a woman, he was going to take a hatchet and slice her head in two; that is on tape. Do you know that was said in open Court?

A. No.

Q. Do you know that Anthony Di-Salvo was co-defendant in that case?

A. No.

Q. Do you know he was also inter-‚cepted over the course of a Court-authorized wiretap interception?

A. No.

Q. And, he was making reference to what he would do to the victim if she didn't pay the money that she owed Frank Sindone?

A. No.

Q. Isn't Anthony DiSalvo a loan-shark?

A. I don't know.

Q. Do you know whether Mr. Serubo is indebted to loansharks?

A. I don't know.

Q. Do you know whether Mr. Plachter is?

A. I don't know.

Q. Do you have any indirect knowledge of that?

A. No.

31a–33a. The government does not dispute that the prosecutor failed to lay any evidentiary foundation for his attempt to link the defendants with organized crime. Nor did he disclose to the grand jury the fact, known to him, that DiSalvo and Sindone had been acquitted of the loansharking charges brought against them.

Pichini also took it upon himself to comment upon the veracity of witnesses before the grand jury. During the testimony of Donald Brown he asked:

Q. Why is it, Mr. Brown, that when we bring people in before the Grand Jury who have worked at Plachter-Serubo, that seems to be no longer connected with Plachter-Serubo, they always seem to be giving us answers which are a little bit more candid than the people we bring before the Grand Jury who are presently employed? That is, with respect to any possible criminal activities.

The present employees seem to be in a vacuum out there, or they seem to be blind to all these things that everyone else tells us about. It seems incredible that you haven't heard about these things. I'm not saying necessarily that you had direct knowledge, but my questions now really deal with any indirect knowledge, with any rumors that you had heard; and it does seem incredible that you had not heard anything at all.

84a–85a. Pichini similarly impugned the testimony of other witnesses who failed to link the defendants to organized crime,[1] and hectored other uncooperative witnesses for their failure to comply with unrelated Federal laws.[2] After reviewing this record, the district court concluded that "some of [the prosecutor's] questioning was inconsistent

---

1. Thus during the testimony of Ms. Eleanor Hall, a former employee of the corporation, the following exchange occurred:

Q. How often were Mr. Plachter and Mr. Serubo at the office during the time that you worked there?

A. Quite often, except for when they were on vacation.

Q. How often did they go on vacation?

A. Oh, I really couldn't say. It has been so long since I worked there—You mean, from the whole time I worked there, do you want—Six weeks.

Q. That is probably the most accurate statement of anyone I have heard that has appeared before the Grand Jury today, probably because you don't work there any more. 67a–68a.

2. See testimony of Mervin Piersol. 113a–16a.

with the standards laid down by the American Bar Association and was generally improper, reprehensible and unacceptable." 327a. But relying upon *United States v. Bruzgo*, 373 F.2d 383 (3d Cir. 1967), and *United States v. Riccobene*, 451 F.2d 586 (3d Cir. 1971), he refused to dismiss the indictment. Since there was "an abundance of competent evidence" supporting the indictment, the court concluded that the prosecutor's misconduct could not have prejudiced the defendants. Dismissal under those circumstances, he reasoned, would be a windfall for the defendants, unjustified by any injury to their legitimate interests. Subsequently, the court also denied the defendants' motion for discovery of the remaining 18 grand jury transcripts, ruling as follows:

. . . although *some* of the prosecutor's questioning of grand jury witnesses was improper, the Court finds that defendants have not made a sufficient showing of need to require disclosure of the grand jury testimony of all witnesses. As there was sufficient evidence presented to the grand jury upon which it could return its indictment, *United States v. Riccobene*, 451 F.2d 586 (3d Cir. 1971), additional disclosure of grand jury testimony will not serve any significant purpose in this matter.

### B. *Discussion*

■ The district court apparently read *United States v. Bruzgo*, 373 F.2d 383 (3d Cir. 1967), and *United States v. Riccobene*, 451 F.2d 586 (3d Cir. 1971), as holding that where an indictment is supported by sufficient evidence, prosecutorial misconduct in the procurement of the indictment is, as a matter of law, harmless error. Based on that analysis, it appears to have concluded that further discovery could not change the ruling on the motion to dismiss. That conclusion was error.

In federal criminal proceedings, the right to indictment by an unbiased grand jury is guaranteed by the fifth amendment. *Costello v. United States*, 350 U.S. 359 (1956). When the framers of the Bill of Rights placed that requirement in the fifth amendment, "they were not engaging in a mere verbal exercise." *United States v. Estepa*, 471 F.2d 1132, 1136 (2d Cir. 1972). The fact that grand jury proceedings are secret, *ex parte*[3] and largely under the control of the federal prosecutor, magnifies this concern. Aware of the potential for abuse inherent in grand jury proceedings, this court and others have increasingly exercised our supervisory power over the administration of justice to regulate the manner in which grand jury investigations are conducted. *E. g., In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973) *(Schofield I); United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972) (Friendly, J.).

*United States v. Bruzgo*, 373 F.2d 383 (3d Cir. 1967), and *United States v. Riccobene*, 451 F.2d 586 (3d Cir. 1971), both recognize the authority of this court, in the exercise of its supervisory power, to order the dismissal of the indictment as a remedy for prosecutorial misconduct before the grand jury. In *Bruzgo*, the defendant alleged that the prosecutor had threatened a reluctant witness before the grand jury with loss of citizenship, and had called her a "thief" and a "racketeer." 373 F.2d at 384. In *Riccobene*, the prosecutor informed the grand jury that a crucial witness would not testify because he feared the defendants, who were "connected with organized crime and could harm him." 451 F.2d at 587. While in both cases we condemned the conduct of the prosecutor, we rejected the defendants' claim of prejudice on the ground that since "an abundance of competent evidence" supported the indictment, the prosecutor's misconduct could not have had any

**3.** *See United States v. Remington*, 208 F.2d 567, 573 (2d Cir. 1953), *cert. denied*, 347 U.S. 913, 74 S.Ct. 476, 98 L.Ed 1069 (1954) (L. Hand, J., dissenting) ("Save for torture, it would be hard to find a more effective tool of tyranny than the power of unlimited and unchecked *ex parte* examination.").

material effect on the grand jury's decision to indict.

*Bruzgo* and *Riccobene* recognize that where a defendant can show actual prejudice resulting from the misconduct of the prosecutor before the grand jury, suppression would be proper. They do not stand for the broader proposition that use of the supervisory power to dismiss an indictment is never proper in the absence of actual prejudice. Prejudice to the individual defendant has never been required in order to justify the exercise of the supervisory power. *See*, Note, *The Supervisory Power of the Federal Courts*, 76 Harv.L.Rev. 1656, 1657 (1963). Our recent decision in *United States v. Birdman*, 602 F.2d 547 (3d Cir. 1979), makes this clear. In *Birdman* the defendants alleged that a government attorney had appeared before the grand jury as a prosecutor and as a witness, and demanded dismissal of the indictment. We found that the defendants had made no showing of prejudice, and therefore refused to order that the indictment be quashed. But we expressly recognized that the use of a prophylactic rule of dismissal might be appropriate. In doing so, we noted that the federal courts have an institutional interest, independent of their concern for the rights of the particular defendant in preserving and protecting the appearance and the reality of fair practice before the grand jury, an interest which could justify the imposition of a prophylactic rule in a proper case. But in the absence of any showing "that the conduct . . . [of the attorney] added substantive matters or was anything but an isolated incident unmotivated by sinister ends" or alternatively, that the practice of prosecutorial testimony was "entrenched and flagrant," we refused to exercise that power. *Id.* at 559.

Our reading of *Birdman* is that dismissal of the indictment may be proper even where no actual prejudice has been shown, if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends, or that the type of misconduct challenged has become "entrenched and fla-

grant" in the circuit. The view that dismissal of an indictment in the exercise of the supervisory power may be an appropriate remedy to correct flagrant or persistent abuse, despite the absence of prejudice to the defendant, is also accepted in the Second Circuit. *See United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976), *cert. dismissed*, 436 U.S. 431 (1978), (failure to provide warnings to grand jury target); *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972), (repeated use of hearsay evidence before the grand jury).

We recognize that dismissal of an indictment may impose important costs upon the prosecution and the public. At a minimum, the government will be required to present its evidence to a grand jury unaffected by bias or prejudice. But the costs of continued unchecked prosecutorial misconduct are also substantial. This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

We suspect that dismissal of an indictment may be virtually the only effective way to encourage compliance with these ethical standards, and to protect defendants from abuse of the grand jury process. Certainly the constant flow of cases to this court involving prosecutorial misconduct before petit juries demonstrates that judicial "tongue clicking" and adjurations as to the "better practice" are likely to have little

impact on the problem. *See United States v. Agee*, 597 F.2d 350, 371 (3d Cir. 1979) (en banc) (Gibbons, J., dissenting) (citing cases). And while professional disciplinary sanctions may be available, *see United States v. Birdman*, 602 F.2d at 556 n. 34, criminal defendants are unlikely to be in a position to initiate such proceedings, or to see that they are pressed to a successful conclusion. On the other hand, we think that the prospect of cases lost because of attorney misconduct is likely to produce a sharp improvement in the procedures adopted by United States Attorneys to control attorney conduct before the grand jury.

Here the prosecutor's misconduct was extreme. The graphic and misleading reference to Cosa Nostra hatchet men, for example, was a blatant invitation to associate the defendants with a disfavored criminal class, and was inconsistent with the American Bar Association Standards Relating to the Prosecution Function. In particular, Pichini acted inconsistently with Standard 3.5(b), Relations with Grand Jury, admonishing that "[the prosecutor] should give due deference to [the grand jury's] status as an independent legal body," and that he "should not make statements or arguments in an effort to influence the grand jury action in a manner which would be inadmissible at trial before a petit jury." Certainly the references to Frank Sindone's violent conduct and organized crime associations went far beyond what Standard 3.5 would permit. *See also* Standard 3.6(a). This conduct is fully as unsavory as that challenged in *Bruzgo* and *Riccobene*. And here, in addition, the partial transcript of the proceedings thus far released indicates that this conduct was only one of several instances of improper or borderline conduct before the grand jury.

Equally important, this case follows our decisions in *Riccobene* and *Bruzgo*. Our review of the cases decided in the federal circuit courts over the past fifteen years discloses not one case of prosecutorial misconduct before the grand jury remotely approaching that found in those two cases. We have no desire to add a third example to that list. In the face of this record of abuse, we feel that "[w]e cannot, with proper respect for the discharge of our duties, content ourselves with yet another admonition," *United States v. Estepa*, 471 F.2d at 1137, and under normal circumstances, we would be compelled to vacate the defendants' pleas and remand for a dismissal of the indictments.

On this record, however, that remedy would be premature, for here two grand juries participated in the investigation, and the indictment in issue was handed down by the second grand jury. All of the examples of Mr. Pichini's misconduct that have been cited to us occurred in the course of the first grand jury proceeding. If his misconduct was confined to that proceeding, and none of it affected the second, the defendants had the benefit of consideration of the charge by a panel unaffected by his effort to create bias or prejudice. The presence of an independent grand jury would satisfy our concerns to preserve both the fact and the appearance of fairness in grand jury proceedings. No more would be required to sustain the indictment. But as we indicated above, it is impossible on the record before us to tell if that is what occurred here. For of the 50 witnesses who testified, only 32 transcripts of testimony have been disclosed. We cannot tell which of the remaining 18 witnesses testified before the second grand jury. Nor can we determine whether transcripts of the testimony before the first grand jury were considered by the second. We do know, however, that Mr. Pichini also conducted the interrogation of witnesses before the second jury. Given his course of conduct in the first proceeding we are unwilling simply to presume the absence of impropriety in the interrogation of the other eighteen witnesses.

In the circumstances of this case, where the record already shows significant improprieties, and where it is known that some material obtained by the first grand jury was made available to the second, and that the offending prosecutor examined witnesses before the second jury, we think that a remand is required in order to permit the defendants to examine the undisclosed tran-

scripts of the second grand jury proceeding. If the improprieties to which we have referred infected the proceedings before the second grand jury because transcripts reflecting them were utilized, the indictment should be quashed. If the second grand jury was insulated from the effects of Pichini's misconduct, and no similar misconduct occurred in his presentation to it, the motion to dismiss may properly be denied. Obviously some further hearing on the motion to quash will be necessary in order to make the foregoing determinations. But even in the event that prosecutorial misconduct did not in any way taint the proceedings before the second grand jury, its occurrence may not simply be disregarded. Thus we instruct the trial court, upon completion of the hearing, to furnish to the Attorney General of the United States copies of the transcripts reflecting prosecutorial misconduct so that the Justice Department may consider appropriate discipline.

## IV. JOINDER OF OFFENSES

The defendants contend that their motion to sever pursuant to Fed.R.Crim.P. 8(a) and 8(b) was improperly denied. The gist of defendants' objection to joinder is that the prosecution did not adequately allege that the conspiracy corporate tax counts and the individual personal tax counts were part of "the same act or transaction or . . . the same series of acts or transactions." Fed.R.Crim.P. 8(a), (b). The personal tax offenses, they contend, are separate and distinct, and cannot be charged with the corporate tax offenses. Moreover, since each of the defendant's individual tax claims are unrelated to the others, it is argued, severance was also required on the basis of impermissible joinder of defendants.

The defendants, however, were charged with, and pleaded to, a count of conspiracy. In *United States v. Somers*, 496 F.2d 723, 729–30 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974), this court held that an allegation of conspiracy satisfied Rule 8's requirement that the offenses joined must constitute a single series of acts or transactions. The court stated:

[P]rovided that the conspiracy charge is put forward in good faith, the combination of a conspiracy count with counts charging acts in furtherance of the conspiracy will survive attack under Rule 8(b).

*Id.* at 730. We think the same standard would apply under Rule 8(a). Here the indictment charged a conspiracy, and the personal tax counts were in furtherance of the conspiracy. Joinder was therefore proper.

## V. CHANGE OF VENUE

The motions of Plachter and Serubo for a change of venue because of prejudicial pretrial publicity were predicated upon the publication of two newspaper articles mentioning Serubo, but not Plachter or Brown, published a month and a half prior to trial. The trial court concluded that it would wait until after *voir dire* of the jurors to determine the effect of the articles. In the circumstances of this case, where the allegedly prejudicial pretrial publicity was relatively remote in time, not pervasive, and comparatively innocuous, postponing the determination as to the availability of an unbiased jury until *voir dire* was appropriate. *See United States v. Haldeman*, 181 U.S.App.D.C. 254, 285, 286, 559 F.2d 31, 62–63 (D.C. Cir. 1976); *United States v. Sinclair*, 424 F.Supp. 719, 721 (D.Del.1976), *aff'd mem.*, 566 F.2d 1171 (3d Cir. 1977).

## VI. CONCLUSION

The judgments of sentence will be vacated and these cases will be remanded to the district court for further proceedings consistent with this opinion.