Judge GUTIERREZ,
dissenting.
I respectfully dissent as to Section II, part B. I would hold the indictment should have been dismissed given the egregiousness of the prosecutorial misconduct and the resulting prejudice.
Regarding the severity of the misconduct, I disagree with the majority’s conclusion that it did not reach the level of egregiousness warranting dismissal of the ease. While the majority declines to characterize it as such, the record establishes that Lt. Crawford’s false testimony in this instance amounted to perjury.[2] Under Idaho law defining perjury, “[a]n unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false.” I.C. § 18-5408. See also State v. Wolfram, 145 Idaho 44, 46, 175 P.3d 206, 208 (Ct.App.2007). Here, Lt. Crawford testified at the hearing on Marsalis’s motion to dismiss the indictment that he was told by the lab there may have been an insufficient sampie of the powder in the Listerine packet to allow for forensic testimony, but had not been aware of definitive results either way prior to testifying before the grand jury. Yet, Lt. Crawford testified unequivocally in front of the grand jury that there was not a sufficient sample to test. Not surprisingly, the district court found both Lt. Crawford and Christiansen knew the Listerine container contained a sufficient sample for testing and the result of the test was negative, not inconclusive.
Turning to the prejudicial effect of the false evidence, by the State’s own concession at the hearing on Marsalis’s motion to dismiss the indictment, the dominant theme of the ease presented to the grand jury was that Marsalis administered some form of a date rape drug to KG. in order to incapacitate her and facilitate the commission of rape. Supporting this theory, Christiansen elicited testimony from KG. that a shot Marsalis insisted she drink tasted bitter and she noticed a granular substance at the bottom of the glass — which the bartender later testified was not normally found in the drink. Additionally, Lt. Crawford indicated he proceeded with the investigation under the assumption a date rape drag may have been used.
The State especially drove home its point as to the date rape drug theory by presenting extensive, detailed testimony by a forensic scientist from the state laboratory. The forensic scientist, after indicating she possessed “specialized knowledge” with regard to date rape drugs and describing her training and experience in the area, proceeded to discuss the types of date rape drugs in existence; how they are administered in a date rape setting (“covertly” and often in beverages); whether there is any “flavor,” color, and/or odor associated with certain date rape drugs; how long they take to dissolve in beverages and to exhibit their effects; whether they leave residue; the goal of their usage; the common physical and mental effects experienced by persons under *880 their influence; how long the effects last; how alcohol impacts their effects; how long they remain in a person’s system and detectable in urine and blood; how they eliminate from a person’s system; and the effects of date rape drugs on the body as compared to alcohol. In stark contrast, the forensic scientist testified very briefly as to the effects of alcohol alone.
It is also apparent the State deliberately elicited and then emphasized the forensic scientist’s testimony in an effort to bolster its date rape drug theory of the case.[3] As indicated above, emphasis was placed on the Listerine container with a powdery substance inside — a detail that, under different circumstances, would likely have been considered innocuous. Also, the prosecutor elicited testimony from the forensic scientist that a certain date rape drug, GHB, may have a “salty or soapy” taste and some date rape drugs may leave a residue when dissolved within a beverage — testimony reminiscent of K.G.’s statements regarding the taste and appearance of a shot Marsalis purchased for her. The prosecutor also guided the forensic scientist to testify that a victim may experience loss of consciousness with “flashes” of memory, as well as what a victim would feel like the next day — including nausea, vomiting, dizziness, lethargy, and like they have the “worst” hangover of their life — all symptoms K.G. testified she experienced the night of the incident and the next day. Furthermore, the forensic scientist testified GHB is detectable in urine for only approximately six to eight hours — allowing the State to explain why K.G.’s urinalysis did not detect any foreign substances. Finally, Christiansen elicited testimony specifically as to the likely effect in a person who drank alcohol and consumed date rape drags— again referencing K.G.’s exact description of the incident.
As Marsalis points out on appeal, since there was no evidence of date rape drugs found in K.G.’s urine, Lt. Crawford’s false testimony referenced the only remaining physical evidence to support the State’s contention a date rape drug was used — and thus was responsible for leaving open the possibility of the jurors accepting the State’s date rape drug theory. It is also clear from the transcript the date rape drug theory was the area of focus for the grand jury, as there were numerous questions asked by the jurors on the issue, especially to the state laboratory employee. Finally, contributing to the importance of the false evidence, there was the fact that, during the grand jury proceedings, the DNA test results indicating the presence of Marsalis’s semen — from which the grand jury could find sexual intercourse even occurred — were not yet available.
In addition, the context of the prosecutor’s behavior in this instance makes it especially troubling. It is well settled that prosecutors have “the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.” State v. Tupis, 112 Idaho 767, 772, 735 P.2d 1078, 1083 (Ct.App.1987) (citing Idaho Rules of Professional Conduct Rule 3.8 comment (1986)) (emphasis added). This role is especially magnified in the context of a grand jury proceeding, the very nature of which completely excludes a defendant and an impartial judge and thus bestows the prosecutor with significant power. As the Third Circuit Court of Appeals has noted:
[T]he prosecutor operates without the cheek of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor’s abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indict *881 ment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.
United States v. Serubo, 604 F.2d 807, 817 (1979) (emphasis added). Accord United States v. Williams, 504 U.S. 36, 62, 112 S.Ct. 1735, 1750, 118 L.Ed.2d 352, 374-75 (1992) (Stevens, J., dissenting); State v. Jones, 125 Idaho 477, 491-92, 873 P.2d 122, 136-37 (1994) (Bistline, J., dissenting).
In light of this imbalance and the resulting burden on the prosecution, and for the reasons above, I conclude that the indictment should have been dismissed and would reverse the district court’s order denying the motion to dismiss the indictment.

. Idaho Code § 18-5401 states:
Every person who, having taken an oath that he will testify, declare, depose, or certify truly, before any competent tribunal, legislative committee, officer, or persons in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states as true any material manner which he knows to be false, is guilty of perjury.

. I do not imply such deliberate elicitation itself was improper — it certainly is within the prosecutor's prerogative to do so. However, I point it out as evidence of the emphasis the State placed on its date rape drug theory.