UNITED STATES of America, Appellant,

v.

Estelle JACOBS a/k/a "Mrs. Kramer,"
Defendant-Appellee.

No. 581, Docket 75-1319.

United States Court of Appeals,
Second Circuit.

Argued Nov. 22, 1976.

Decided Dec. 30, 1976.

Edward R. Korman, Chief Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellant U. S. A.

Irving P. Seidman, New York City (Rubin, Seidman & Dochter, New York City, of counsel), for defendant-appellee.

Before FEINBERG, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

GURFEIN, Circuit Judge:

This appeal is before us again on a remand, at the suggestion of the Solicitor General, "for further consideration in light of *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976)." —— U.S. ——, ——, 97 S.Ct. 299, 299, 50 L.Ed.2d 277.[1] This affords us an opportunity to explicate our previous opinion, *United States v. Jacobs,* 531 F.2d 87 (2d Cir. 1976).[2] In that opinion we affirmed the dismissal of a perjury count against defendant Jacobs, the necessary predicate of which was her testimony before the grand jury, which we held had been properly suppressed in the circumstances.

I

When we filed our decision, the Supreme Court had not yet reversed the Fifth Circuit in *Mandujano,* 496 F.2d 1050 (5th Cir. 1974), the authority relied upon by the District Court in our case. But the Supreme Court had already granted certiorari.

Although perhaps it could have been made clearer in our previous opinion, the justices who dissented on the remand were correct in surmising that we intended to make explicit in our opinion that we were familiar with the Fifth Circuit opinion in *Mandujano,* and that we were unwilling to acquiesce in it on constitutional grounds. We did not purport to establish a continuing requirement, but to impose a one-time sanction to encourage uniformity of practice (whatever the practice might be) between the Strike Force and the United States Attorney in the *same* district. We refused to affirm the District Court on the basis of the *constitutional* doctrine of *Mandujano* which it had accepted as correct. In that sense we may be said to have anticipated the decision of the Supreme Court, now called to our attention on remand.

In this circuit the thrust of the case law, from a constitutional point of view, has been more akin to the Supreme Court's subsequent decision in *Mandujano* than to the decision of the Fifth Circuit. *E. g., United States v. Del Toro,* 513 F.2d 656, 664 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). In *Jacobs,* we noted, however, that in *Del Toro* and in a series of similar cases, the defendant had, in practice, always been warned that he was a target of the investigation.[3] That this has been the uniform practice of prosecutors in

---

1. Mr. Justice Stewart and Mr. Justice Marshall each wrote dissenting opinions. Mr. Justice Stewart also concurred in Mr. Justice Marshall's opinion as did Mr. Justice Brennan. Mr. Justice Stevens concurred in the decision to remand for clarification of one point.

2. Because we were exercising supervisory power, contrary to our usual practice, the opinion was circulated before filing to all active and senior judges of the circuit. Four active judges, in addition to the panel, indicated agreement in written memoranda. One active judge was away and did not respond. Only one active judge would have voted to reverse. No senior judge suggested reversal. Two senior judges wrote memoranda, one indicating agreement, and the other concurring in the result. We did not mention this originally because we deemed it an internal matter.

3. *See, e. g., United States v. Bonacorsa,* 528 F.2d 1218, 1223 (2d Cir. 1976) (appeal from E.D.N.Y.); *United States v. Del Toro,* 513 F.2d 656, 660 (2d Cir. 1975); *United States v. Corallo,* 413 F.2d 1306, 1328, 1329, n.6 (2d Cir.), *cert. denied,* 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); *United States v. Capaldo,* 402 F.2d 821 (2d Cir. 1968); *United States v. Irwin,* 354 F.2d 192, 199 (2 Cir. 1965), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966); *United States v. Winter,* 348 F.2d 204, 205–06 (2d Cir.), *cert. denied,* 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). *Cf. United States v. Scully,* 225 F.2d 113, 116 (2d Cir.), *cert. denied,* 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955).

our circuit, for much longer than twenty years, was perceptively observed by Judge Medina in *United States v. Scully,* 225 F.2d 113, 116 (2d Cir. 1955). Since the Strike Force prosecutor failed to give such warning, we were unable on this appeal to distinguish the Fifth Circuit opinion in *Mandujano,* as we were able to do in *United States v. Bonacorsa,* 528 F.2d 1218, 1223 (2d Cir. 1976), a decision in which two members of the *Jacobs* panel, Judges Feinberg and Van Graafeiland, concurred.

While we did not think the warning to be necessary on *Miranda* grounds, we also did not believe that because an omission by a prosecutor is within constitutional limits, he *must* necessarily omit that which he is constitutionally permitted to omit. What the Constitution does not require it does not necessarily forbid.

Surprised, as we were, to find that what we had thought to be a common practice of prosecutors in the circuit for more than twenty years was not followed, we canvassed each of the United States Attorneys in the circuit for their practice in this regard. We were informed that every United States Attorney, in practice, warns the potential defendant that he is a target of the investigation. The appeal before us involved a prosecution by the Strike Force in the Eastern District of New York as authorized by 28 U.S.C. § 515.

The Strike Force, consisting of special attorneys appointed by the Attorney General, operates theoretically under the supervision of the United States Attorney. 28 U.S.C. § 543.[4] *See In re Subpoena of Persico,* 522 F.2d 41, 56 (2d Cir. 1975). (For instance, in this appeal the Strike Force filed papers under the name of the United States Attorney for the Eastern District of New York.) The Attorney General has promulgated guidelines "governing interrelationships between Strike Forces and United States Attorneys' Offices."[5] The Guidelines provide that "[w]hen a specific investigation has progressed to the point where there is to be a presentation for an indictment, the Chief of the Strike Force shall then for this purpose operate under the direction of the United States Attorney who shall oversee the judicial phase of the development of the case."

Though we did not think it necessary to spell it out in our earlier opinion, we think that this prescribed direction by the United States Attorney applies to this case. As we noted, "[operation] under the direction of the United States Attorney . . . should have been assumed by the Strike Force." 531 F.2d at 90, n.6.

We did not specifically refer to the analogy of an agency being required to adhere to its own regulations, *Service v. Dulles,* 354 U.S. 363, 732, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), because we recognized that the Attorney General in his prosecutorial function may be, strictly speaking, less restricted than the Secretary of State. However, the analogy is persuasive when the Attorney General actually promulgates Guidelines for supervision by the United States Attorney in specific circumstances, *see United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970); *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969) (*non-constitutional* ground), and inconsistent treatment results therefrom.

We exercised supervisory power in the limited area of the relationship between the Strike Force attorney and the United States Attorney under a fair inference from the Guidelines, though not as a generally applicable exclusionary rule. Although we have confirmed the right of Strike Force attorneys to appear before the grand jury, *see Persico, supra,* we are not committed by statute to allowing them to come into the circuit and to evade the rules and supervision of the United States Attorneys. We

---

4. Section 543 applies to "special attorneys" appointed to appear before the grand jury, § 515(a); Assistant United States Attorneys are appointed under § 542.

5. Office of the Attorney General, Order No. 431–70, Establishing Guidelines Governing Interrelationships Between Strike Forces and United States Attorneys' Offices, reprinted in *In re Subpoena of Persico,* 522 F.2d 41, 68 (2d Cir. 1975) (appendix) (hereinafter "Guidelines").

think it our duty to avoid uneven justice in the circuit, resulting from mere negligence or inattention to established practice and guidelines. There is, of course, nothing to prevent the Department of Justice from formulating a national policy to *prohibit* all prosecutors from following the ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function (Approved Draft 1971) Section 3.6(d) which provides:

"If the prosecutor believes that a witness is a potential defendant he should not seek to compel his testimony before the grand jury without informing him that he may be charged and that he should seek independent legal advice concerning his rights."

It is an important function of the administration of criminal justice to let our citizens know that equal justice is available to all, as the Chief Justice has so eloquently said on more than one occasion. Having determined that the policy of the various prosecutors should be uniform—constitutional limitations quite aside—we were confronted with the proper remedy to apply. Normally, any appellate court finds itself in a veritable dilemma when its choice is between vindicating a rule by sanction and allowing a possibly guilty person to escape. In this case, fortunately, we faced no such dilemma. For the appellant remains indicted for the substantive crime, and, if certiorari had not been applied for, would already have been tried by a jury. *See United States v. Mandujano, supra,* 425 U.S at 569, 96 S.Ct. at 1773 n.2, 48 L.Ed.2d 212, where the prosecutor obtained a conviction on the substantive count before the Supreme Court heard the appeal on the perjury count.

We abhor perjury, but the limited question is whether, in these particular circumstances, the prosecution was entitled to the luxury of a perjury count, which in this case was essentially a strategic ploy which would make conviction on the substantive count easier if the counts were to be joined in a single trial.[6] In this case, the Government claims to have a recorded transcript which purportedly establishes guilt on the substantive count. To quote Judge Stevens (now Mr. Justice Stevens) in a similar connection:

"Accepting the prosecutors' evidence as true, defendant's participation in the crime had already been established and, therefore, no further investigation was necessary. . . . If the evidence of guilt is as strong as the prosecutor contends, such direct communication [with the defendant in the absence of counsel] is all the more offensive because it was unnecessary. If there is doubt about defendant's guilt, it should not be overcome by a procedure such as this." *United States v. Springer,* 460 F.2d 1344, 1354 (7th Cir. 1972) (dissenting opinion).

Finally, we should state in response to the request for clarification in Mr. Justice Stevens' concurring opinion that we did not assume that an error of the prosecutor in failing to give warning in the grand jury would lead inexorably to the conclusion that the witness cannot be prosecuted for perjury. On the contrary, we had assumed the opposite,—that she could be so prosecuted [7] as the Supreme Court later held in *Mandujano.*

For the reasons previously stated, our opinion was based only on our supervisory power, exercised in a circumscribed manner involving the Strike Force, and in circumstances where under the sanction imposed, a guilty person, in any event, would not be likely to escape conviction because of our ruling.

We intended our opinion to have no prospective application as precedent for the District Courts on the constitutional issue. Our only purpose was to make the practice of the Task Force conform to that of the

---

**6.** The maximum penalty for violation of 18 U.S.C. § 1623 is imprisonment for five years and a $10,000 fine. It is hardly likely that upon conviction of a first offender, this maximum would be inadequate.

**7.** *Cf. United States v. Winter, supra,* 348 F.2d at 208.

United States Attorney in the *same* district, and we think that the sanction of suppression is salutary in the circumstances.

## II

After the remand we ordered a second oral argument. The Government presses two points: (1) that we do not have power to suppress the testimony, and (2) that *Mandujano* compels reversal of Judge Neaher's order suppressing the testimony and dismissing Count Two.

■ At oral argument, the Government conceded, perhaps reluctantly, that the Courts of Appeals do have supervisory power. Mr. Justice Rehnquist stated the general rule, in *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973):

"Within such a unitary jurisdictional framework the appellate court will, of course, require the trial court to conform to constitutional mandates, but it may likewise require it to follow procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution." [8]

The supervisory power in criminal cases was stated to exist in the oft-cited case of *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943), with respect to the Supreme Court. The Courts of Appeals have repeatedly exercised this power in criminal actions. In *Burton v. United States,* 483 F.2d 1182 (9th Cir. 1973), the court quoted the Supreme Court's statement in *LaBuy, supra* note 8, that "supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal sys-

tem", 352 U.S. at 259–60, 77 S.Ct. at 315, and noted that "this pronouncement . . . has been reaffirmed by every Court of Appeals". 483 F.2d at 1187.[9] And in this Circuit the power has been clearly recognized. *See United States v. Toscanino,* 500 F.2d 267, 276 (2d Cir. 1974); *United States v. Estepa,* 471 F.2d 1132, 1136 (2d Cir. 1972); *United States v. D'Angiolillo,* 340 F.2d 453, 456 (2d Cir.), *cert. denied,* 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965); *United States v. Dooling,* 406 F.2d 192, 198 (2d Cir. 1969).[10]

A specific example that comes to mind relates to the *Allen* charge. In *Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the Supreme Court approved a lower court charge which still bears the name of that case. Despite this *imprimatur,* some federal courts of appeals, in avowed exercise of their supervisory power, have directed trial judges not to use it. *United States v. Thomas,* 146 U.S.App. D.C. 101, 449 F.2d 1177, 1186 (1971); *United States v. Fioravanti,* 412 F.2d 407, 420 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); *United States v. Brown,* 411 F.2d 930, 933 (7th Cir. 1969), *cert. denied,* 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970). These cases surely do not demonstrate a disrespect for the Supreme Court. They perhaps, in part, represent a recognition of the undesirability of unequal treatment, as evidenced by many appeals, when some judges use the *Allen* charge and others do not.

Despite this cogent history of the supervisory powers of the federal courts of appeals, the Government contends that two Acts of Congress stand in the way of the exercise of such supervisory power. First,

---

**8.** While *Cupp* involved a state court appeal, the quoted discussion concerned the federal Courts of Appeals. In any case, it is clear that there is federal supervisory power of the Court of Appeals over the District Courts. *See La Buy v. Howes Leather Co.,* 352 U.S. 249, 259–60, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957).

**9.** Of the 30 cases cited in *Burton* for this proposition, 25 involved criminal actions or grand jury proceedings.

**10.** In *United States v. Freeman,* 357 F.2d 606, 614 (2d Cir. 1966), Judge Kaufman (now Chief Judge) noted that "our duty to supervise the administration of criminal justice in the courts of this Circuit can hardly be subject to the same restrictions as our power to impose constitutional requirements upon unwilling state tribunals".

it points to 18 U.S.C. § 3501(a) which provides that a confession, which includes "any self-incriminating statement" 3501(e), "shall be admissible in evidence if it is voluntarily given," and draws the conclusion that the Court of Appeals therefore had no power to suppress it. On its face, Section 3501 deals with the admissibility of confessions at *trial.* At such trial, the trial judge is not compelled to admit the "confession" unless he finds it voluntary, but "in determining the issue of voluntariness [he] shall take into consideration all the circumstances surrounding the giving of the confession." § 3501(b). Among the enumerated factors to be considered is "whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession." There is no evidence that Mrs. Jacobs had such knowledge. Nor do we see by what semantic process a denial of guilt can be called a confession. A denial is not an admission, and by the same token, it is not a "confession" or "self-incriminating statement."

■ Second, the Government takes the extreme position that by Rule 402 of the Federal Rules of Evidence (a Congressional enactment) relevant evidence is to be excluded solely in those cases where exclusion is required "by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." It offers no history to support the view that Congress was concerning itself with the supervisory powers of the federal courts. The obvious purpose of the catchall clause was to bar common law rules of evidence or state rules of evidence, if inconsistent.

In deciding the issue we need not agree or disagree with the dictum concerning § 3501(a) in *United States v. Crook,* 502 F.2d 1378 (3d Cir. 1974), *cert. denied,* 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975). In that case there was a claim of violation of *Massiah* rights [11] by the FBI in questioning Crook. The Court of Appeals held that appellant had knowingly waived his right to consult counsel and that "there was full compliance with *Miranda.*" Therefore, the reference to Section 3501(a) was unnecessary to the decision. In *Crook* failure to give notice *precluded* a knowing waiver. Finally, in *Crook,* there was a real "confession" not a denial of guilt.[12]

It requires a good deal of stretching to say that these general statutes, in any event, were preclusive of supervisory power which is exercised, not in derogation of a procedural rule or statute, but for the limited purpose of preventing chaos in criminal law administration through the presence in the same district of a two-headed prosecution branch operating on conflicting procedures. We assert no roving commission to right the wrongs of criminal defendants.

It is in the exercise of that extremely restricted assertion of supervisory power that we approach our duty under *Mandujano.* We have recognized that a constitutional claim may not be asserted as a defense to a perjury charge. *United States v. Winter, supra,* note 7. And implicit in our previous opinion was the recognition of *United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), and related cases. We also clearly noted that a potential defendant had no constitutional right not to be called before the grand jury, citing *Winter, supra,* and *United States v. Dionisio,* 410 U.S. 1, 10, n.8, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). We did not think it useful to explore the constitutional situation in detail, for we relied on no constitutional doctrine in imposing the sanction.

11. *See Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

12. "Crook is before the District Court on an indictment charging robbery of a Wyncote, Pennsylvania bank, and the challenged statement *admitted* that he did so." 502 F.2d at 1379 (emphasis added). *See also United States v. DiGilio,* 538 F.2d 972 (3d Cir. 1976). This case relied upon *Crook* and involved no question of whether defendants are treated differently by the Strike Force than the normal practice would require.

## III

 What we must now reconsider is whether the sanction we imposed was too harsh for the didactic purpose intended in light of *Mandujano*. Here we find some difficulty in assessing the meaning of the remand.

We do not know whether the Supreme Court meant that we should, under no circumstances, use our supervisory power because this is a perjury case, or whether we should reconsider the sanction of suppression in the light of the constitutional holding of *Mandujano*. We are inclined to believe it is the latter, for the Supreme Court had no occasion in *Mandujano* to consider the effect of a generation of uniform practice by the United States Attorneys in the Second Circuit, now broken apparently by a lack of liaison in the prosecuting function of Government. Moreover, the Fifth Circuit in *Mandujano* had relied on an extension of *Miranda* warnings to grand jury witnesses, which was not our point at all.

We placed no emphasis on the circumstance that this testimony involved a perjury count as well as a count for an alleged violation of 18 U.S.C. § 875(c). We simply affirmed the suppression of appellant's testimony which could presumably be used in the prosecution of the substantive count as well. In sum, we did not agree to the District Court's suppression *because* it was allegedly perjured testimony, nor did we strike the perjury indictment as such.

In imposing the sanction of suppression, and, in these special circumstances, the concomitant dismissal of the perjury count for lack of a predicate, we did not go as far as we did in *United States v. Estepa, supra.* There we reversed a narcotics conviction and dismissed the indictment after a trial establishing guilt, not because of any constitutional mandate, *see United States v. Costello*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), but in the exercise of our supervisory power. There Judge Friendly (then Chief Judge) said " . . . a reversal with instructions to dismiss the indictment may help to translate the assurances of the United States Attorneys into *consist-*

*ent* performance by their assistants." 471 F.2d at 1137 (emphasis added). We have commented *in camera* from time to time on the failure of certain special attorneys to avail themselves of the central repository of legal knowledge and judgment that exists in the regular United States Attorneys' offices.

Since we did not anticipate an affirmance of the Fifth Circuit in *Mandujano* and did not rely on the decision of that Court which was subsequently reversed, we respectfully adhere to our previous decision. We note that it is not intended to mandate any specific procedure, but to serve as an *ad hoc* sanction, as in *Estepa,* to enforce "consistent performance" one way or another. Appellant will, in any event, be tried on a serious substantive count. But the effect of the sanction may be to bring the Strike Force and the United States Attorney to closer harmony, a boon for even-handed law enforcement which often will redound to the benefit of the prosecution rather than of the defense.