UNITED STATES of America,
Plaintiff-Appellee,

v.

Hoyle Wayne WHITAKER,
Defendant-Appellant.

No. 79–5464.

United States Court of Appeals,
Fifth Circuit.

June 27, 1980.

Barry L. Zisser, Robert E. Cosby, Jacksonville, Fla., for defendant-appellant.

Curtis Fallgatter, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before KRAVITCH, HATCHETT and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant appeals from his perjury conviction on various grounds, including sufficiency of the indictment, sufficiency of the evidence, failure to grant a continuance,

improper jury instructions, and several evidentiary rulings. Since the defendant correctly contends that the trial judge committed reversible error by admitting certain irrelevant and prejudicial evidence, we reverse.

*Context Facts*

On September 14, 1978, the defendant, Hoyle Wayne Whitaker, was called before the grand jury pursuant to an investigation into, *inter alia*, alleged kickbacks and unlawful payments to officials of the Millwright & Machinery Erectors Union, Local 2411. As a result of his testimony before the grand jury, the defendant was indicted on five counts of perjury. Although found not guilty on four counts, the defendant was convicted on Count 1 and received a sentence of 18 months imprisonment together with a $3,000 fine.

The defendant was a member of the millwright union, and at trial the government attempted to prove that he had lied to the grand jury concerning his involvement in a scheme whereby certain persons were required to make unlawful payments to the union's business representative, A. J. Spaulding. These persons, permit workers, were non-members of the union who were given permits to work as millwrights when the available work exceeded the capabilities of the members of the union. Many of these permit workers wanted to become members of the union by obtaining their union "book." Several permit workers were allegedly required to pay Spaulding $25 per week to insure that they would be the last permit workers laid off, the first permit workers sent off to a new job, and the first persons to receive a union book.

The government contended at trial that the defendant had acted as Spaulding's agent in soliciting[1] and collecting[2] these payments and that the defendant had been paid for his efforts.[3] Further, the govern-

---

1. Count 2 of the indictment alleged that the defendant had falsely testified that he had never solicited under-the-table payments for A. J. Spaulding.

2. Count 4 of the indictment alleged that the defendant had falsely testified that he had never collected under-the-table payments for Spaulding as Spaulding's "bagman."

3. Portions of Count 3 of the indictment were

ment attempted to prove that the defendant had tried to prevent persons from testifying about the kickback scheme to the grand jury.[4] All of these contentions related to Counts 2, 3, 4, and 5 of the indictment, and the defendant was acquitted by the jury on all four of these counts.

Despite the jury's apparent finding that there was insufficient evidence of the defendant's actual complicity in the scheme, as illustrated by the not guilty verdicts on Counts 2, 3, 4, and 5, the defendant was found to have committed perjury by denying that he had "ever state[d] to anyone that [he] either knew of or had heard of persons making payments or payoffs . . to Andrew Spaulding," or "being requested to," "[e]ither to obtain work on a work permit or to obtain a book." The questions and answers on which Count 1 was based were as follows:

Q Let me repeat that last question. Did you ever state to anyone that you either knew of or had heard of persons making payments or payoffs of any kind to Andrew Spaulding?

A No, sir.

Q Did you ever state to anyone that you either knew of or had heard of persons making payments or payoffs or being requested to to Andrew Spaulding?

A No, sir.

Q Either to obtain work on a work permit or to obtain a book?

A No, sir.

One of the government's main witnesses, Eugene Richardson, testified that Whitaker had solicited and collected payoffs from him while he and the defendant had been working at the Bulk Mail Center. Richardson testified that the defendant had explained that those who paid would be the last laid off, the first to get new jobs, and the first to get their union books. Richardson also testified that the defendant had told him that he would get into trouble if he told everything to the grand jury, and he testified that the defendant had stated that he had received $100 for his part in the scheme.[5] Richardson was vigorously cross-examined and confronted with several inconsistent statements, and his reputation for truth and veracity was put in question by several witnesses. It is apparent from the acquittals on Counts 2 (solicitation), 3 (receipt of $100), 4 (collection), and 5 (encouragement not to talk to grand jury) that much of Richardson's testimony was not believed by the jury.

The other main witness for the government was Eugene Knighton, also a millwright. Although called as a government witness, Knighton was very reluctant to testify. Record on Appeal, Volume III at 377–79. On the stand, Knighton testified that he could not remember for certain what, if anything, the defendant had told him about the kickback scheme. However, Knighton's grand jury testimony, portions of which were read into evidence as substantive testimony, Fed.R.Evid. 801(d)(1)(A), indicated that the defendant had told Knighton about the details of the illegal payments being made to Spaulding.

The defendant took the stand in his own defense and denied having ever lied to the grand jury. Several witnesses testified as to the community reputation for truth and veracity of both Richardson and the defendant, and the jury was essentially left with questions of credibility.

I

The most serious issue raised by the defendant Whitaker concerns the introduction

stricken from the indictment by the trial judge. Record on Appeal, Volume III at 495–96. When it went to the jury, Count 3 concerned only the defendant's allegedly false testimony that he had never stated that he had only received $100 for his work collecting money for Spaulding.

**4.** Count 5 of the indictment alleged that the defendant had falsely testified that he had never encouraged anyone not to talk to the grand jury.

**5.** Richardson's testimony failed to support the allegation that the defendant had stated that he was supposed to receive 10 percent of all monies collected, and it was for this reason that portions of Count 3 of the indictment were stricken. See note 3, *supra*.

of evidence tending to prove that Eugene Richardson had given Spaulding a Bronco truck in exchange for a union book. Richardson was the only witness to testify that the defendant was a participant in the kickback scheme, and his credibility was vigorously attacked in various ways.[6] In order to bolster Richardson's testimony concerning the details of the payoff scheme as related to Richardson by Whitaker, the government introduced testimony that Richardson had in fact received his union book by giving a Bronco truck to Spaulding. The defendant argues that the details of Richardson's transaction with Spaulding were not relevant to whether the defendant perjured himself before the grand jury.

Richardson testified that the following conversation took place shortly before or shortly after[7] Whitaker's grand jury testimony.

> Q  Have you ever had any conversation with Mr. Whitaker about your union book?
>
> A  Well, at St. Regis after he had been down to the grand jury, and before he had been to the grand jury, and—it was said [by Whitaker], "Well, you didn't pay A. J. [Spaulding] anything for your book after paying $25 a week; did you?"
>
> "I sure did. I gave him the Bronco," which was equivalent to $1,400 cash.

Record on Appeal, Volume II at 182–83. The defendant's attorney objected that this testimony was irrelevant because the transaction referred to took place between Spaulding and Richardson and not the defendant. The objection was overruled.

The error arose when, after properly overruling the objection to this testimony, the trial court permitted *further* testimony concerning the transaction between Spaulding and the witness Richardson. The defendant Whitaker was not a party to this transaction; he was only on trial for perjury as to certain statements. Whether or not the Spaulding-Richardson transaction with the Bronco had in fact occurred was entirely irrelevant to the defendant Whitaker's guilt or innocence of perjury. The erroneous admission of this *subsequent* irrelevant testimony, as will be noted, was prejudicial and cannot be overlooked as harmless.

Over Whitaker's continuing objection as to its irrelevance, the prosecution was permitted to elicit further testimony from Richardson as to the details of the transaction involving Spaulding and the Bronco truck.

According to Richardson, Spaulding had said that he would get Richardson a union book in exchange for the Bronco truck. Record on Appeal, Volume II at 185. Richardson testified:

> A  I met with A. J. Spaulding on the beach  .  .  .  on a Sunday afternoon .  .  . .. And he showed up by himself.
>
> We got in his jeep and rode down the beach  .  .  . .. And he asked me what would be a fair price. And I said $1,400. And he says, "I'll give you this check." And he says, "Don't cash it though, because I've got very little money in this account."
>
> And he said, "When can you get the Bronco over to me?"

> .    .    .    .    .

---

**6.** Richardson was confronted with several inconsistent statements, *e. g.* Record on Appeal, Volume II at 209, 222–24, 227–28, 232–35, and several witnesses testified that his reputation for truth and veracity was poor, *id.*, Volume III at 505, 522, Volume IV at 646. Further, there was testimony that Richardson had himself made kickback collections. *Id.*, Volume III at 527.

**7.** It is not clear from Richardson's testimony whether the conversation took place before or after Whitaker's grand jury testimony. Record on Appeal, Volume II at 183. It could be that there were two such conversations. If the conversation took place after Whitaker had testified, then the defendant's contention of irrelevance is extremely strong. However, the timing of the conversation was not relied upon when the testimony was objected to. Since the testimony is ambiguous, and since we believe that most of the testimony was inadmissible even if the conversation took place prior to the grand jury, we will assume that the conversation between Richardson and Whitaker concerning this payment to Spaulding occurred prior to Whitaker's grand jury testimony.

Q All right. Did you ever cash that check?

A No.

*Id.* at 186.

At this point, the government sought to introduce the $1,400 uncashed check into evidence. Defense counsel again objected, but the trial judge stated that the transaction was "probative of the fact [that] there were under-the-table deals and so forth involving Mr. Spaulding." Record on Appeal, Volume II at 188. The judge stated that he thought that the probative value outweighed any prejudicial effect and that he did not see any prejudicial effect. *Id.* at 187–88.

After the check had been introduced, Richardson testified that he had given Spaulding title to the truck approximately two weekends later. *Id.* at 191. The government then introduced the title certificate over objection. *Id.* at 191–93. Following a short recess, the government attempted to elicit further testimony, but defense counsel objected on the ground of hearsay.[8] The objection was sustained, and there was no further testimony concerning the Bronco truck on direct examination.

On cross-examination, Richardson testified that the defendant's only connection with the Bronco truck was his statement to Richardson, "A. J. sure is interested in your Bronco. He'd like to have it." *Id.* at 255–57. Subsequently, Robert Sloan, another government witness, testified about the details of the transaction between Richardson and Spaulding, as related to Sloan by Richardson. *Id.*, Volume III at 333–36.[9]

The government first argues that the testimony concerning the exchange of Richardson's Bronco for his union book was admissible because it was relevant "to show the intimate *knowledge* the defendant had of Spaulding's scheme to corrupt the union." Government's Brief at 40 (emphasis added). The government contends that the defendant had said that one of the purposes for the kickbacks was to receive a union book, and it is argued that the evidence shows that Richardson indeed received his book by paying off Spaulding with the Bronco. However, the defendant was not charged with complicity in Spaulding's scheme, nor was he charged with having lied to the grand jury about his *knowledge* of the scheme.

In Count I, the defendant was charged with having perjured himself by saying that he had never *stated to anyone* that he either knew of or had heard of payments to Spaulding. The question by the defendant to Richardson asking whether Richardson had had to pay anything for his book other than the $25 per week may have been relevant to Count I, but only if the preface to the question is considered a statement that the defendant had knowledge of the payments.[10] However, all the evidence concerning the details of Richardson's transaction with Spaulding, both testimonial and documentary, was completely irrelevant to Count I; it was irrelevant whether Richardson had truthfully told the defendant that he had traded the Bronco for a union book. The only issue as to Count I was whether

---

**8.** The government argued that Spaulding and Whitaker were co-conspirators and that therefore Richardson could testify as to what Spaulding had said. However, the judge refused to allow any further hearsay testimony. Record on Appeal, Volume II at 194–204.

Since the objectionable evidence was introduced prior to any objection based on hearsay, we consider only the defendant's contention that the evidence was irrelevant and not his belated contention that it was hearsay.

**9.** Sloan also testified that Richardson had said something about paying $1,000 for his book. Record on Appeal, Volume III at 351. The jury never learned the complete details of Richardson's grand jury testimony concerning the

Bronco, but the judge was told everything by counsel. *Id.*, Volume II at 48–49. Richardson was initially given the check and told not to cash it. When Spaulding could not get Richardson his book Richardson apparently was paid $1,400 in cash. Subsequently, Spaulding did get Richardson a book, and Richardson paid Spaulding about $1,000 in cash.

**10.** In asking the question, the defendant *said* something that *indicated that he knew* that Richardson had made payments to Spaulding. However, it is not completely clear that the preface to the question constituted *a statement that he knew* of the payoffs. See note 11, *infra*.

the defendant *had stated* that he either *knew of* or *had heard of* payments to Spaulding. Consequently—although *the conversation* between Whitaker and the defendant may have been relevant—*all other evidence* concerning the details of the transaction between Richardson and Spaulding was irrelevant as to Count I.

The government next argues that the disputed testimony was admissible as to Count V, which alleged that the defendant had lied about not encouraging anyone not to talk to the grand jury. The government contends that the evidence was relevant to show that the defendant knew that Richardson "had additional incriminating evidence against himself and his mentor Spaulding," Government's Brief at 40 n.60, and thus to show that the defendant had "greater motive to attempt to silence Richardson." *Id.* However, even if the conversation between the defendant and Richardson was slightly relevant to show such a motive, the actual details of the Bronco-book exchange again had no relevancy at all. Richardson's testimony concerning the details of the Bronco-book exchange and the documentary evidence of this transaction, consisting of the check from Spaulding and the title certificate, were therefore irrelevant as to Count V.

## II

Since the defendant correctly contends that the trial judge abused his discretion by overruling the objection to the irrelevant evidence concerning the Bronco truck, we must determine whether this error was only harmless error not affecting substantial rights under Fed.R.Crim.Proc. 52(a).

"Perhaps the single most important factor in weighing whether an error was harmful is the strength of the case against the defendant." 3 Wright, Federal Practice and Procedure § 854, at 358. In *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 420 (1946), the Supreme Court cautioned against a rigid reliance on prior cases. "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations." 328 U.S. at 762, 66 S.Ct. at 1246. "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." 328 U.S. at 765, 66 S.Ct. at 1248. Having reviewed the evidence in this case, we conclude that the defendant's substantial rights were affected.

The questions for the jury were essentially ones of credibility. If the jury did not believe the two main government witnesses, then there was no evidence that would support a conviction. The credibility of these two witnesses, Richardson and Knighton, was put in question, as was the credibility of the defendant. Much of Richardson's testimony was apparently not believed by the jury, because the defendant was acquitted on four of the five counts. With respect to Knighton, his testimony at trial was not even favorable to the government. It was only through Knighton's grand jury testimony that the government was able to elicit favorable testimony.

The only apparent reason for introducing the testimonial and documentary evidence concerning the Bronco-book exchange was to bolster Richardson's credibility and to show that in fact there had been payoffs to Spaulding. In fact, it was admitted at oral argument that one of the principal reasons for introducing the documentary evidence was to boost the credibility of Richardson. The jury was given documentary proof that Spaulding was receiving payoffs, but Spaulding was not on trial and his guilt was not at issue. The $1,400 check from Spaulding and the title certificate were not at all relevant to the defendant's guilt of perjury. However, this irrelevant evidence of a sordid shakedown not involving the defendant himself nevertheless prejudicially tended to implicate him in the shakedown as a member of a corrupt group, although he was on trial for perjury, not for corruption.

The government argues that the defendant was not prejudiced because the evidence was cumulative and only reiterated the substance of Richardson's conversation with the defendant. It was not merely cumulative; it greatly amplified and emphasized, in a dramatic and graphic way, incidents of a major extortion, completely irrelevant to the perjury charges for which the defendant was tried. Further, the inadmissible documentary proof that the payoff had taken place tended to make every other statement by Richardson more believable. The jury carried this documentary evidence into its deliberations, and it is impossible to know what impact this evidence had on the credibility decisions that the jury was required to make. It is true that Knighton's credibility was not bolstered by the evidence relating to the Bronco. However, Knighton's trial testimony was completely equivocal, and even a hesitant acceptance of some of Richardson's testimony may have been sufficient to encourage a belief in Knighton's grand jury testimony. Further, it is impossible to know whether the jury's guilty verdict on Count I resulted from Knighton's testimony rather than Richardson's.

The improperly admitted check and title certificate constituted the only documentary evidence that payoffs had been made to Spaulding. The improper bolstering of Richardson's credibility and the documentary evidence of irrelevant corruption may have substantially prejudiced the defendant. Yet this evidence was completely irrelevant to the issue of the defendant's guilt. In view of the closeness of the issues of credibility, the erroneous admission of this irrelevant evidence constituted reversible error. Fed.R.Crim.Proc. 52(a). The conviction must be vacated, and the case must be remanded for a new trial.

### III

Although we have determined that there was reversible error requiring a new trial, the defendant raises three issues that might require us to dismiss the indictment completely. Consequently, these issues must be discussed.

### (A)

The defendant argues that the questions he was asked before the grand jury were so imprecise that they are insufficient as a matter of law to support an indictment for perjury. The defendant relies on *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), for the proposition that the indictment must be dismissed because the prosecutor failed to precisely question the defendant.

The questions and answers on which Count I was based have been quoted in the Context Facts. The defendant contends that the prosecutor's use of the conjunction "or" in the three questions resulted in a combination of several questions being asked at once. The defendant claims that he was asked eight questions at the same time: "Did you ever state to anyone that you either knew of *or* had heard of persons making payments or payoffs of any kind" "*or* being requested to to Andrew Spaulding," "either to obtain work on a work permit *or* to obtain a book?" The defendant's reliance on *Bronston* is misplaced.

In *Bronston* the Court stated that "[p]recise questioning is imperative as a predicate for the offense of perjury," 409 U.S. at 362, 93 S.Ct. at 602. There the defendant had not directly responded to the question, and the Court reversed the conviction because the prosecutor had failed to follow the defendant's evasive answer with a more precise question. Since the defendant's evasive response had been literally true, there was no basis for a perjury indictment. In the instant case, however, the defendant did not evade the question or qualify his answer. He did not hesitate to categorically respond, and the government has the right to prove that this categorical answer was knowingly and intentionally false. On the other hand, the defendant has the right to prove that he either answered the question truthfully *or* that the question was so ambiguous or misleading that he only unintentionally gave an untrue answer.

▮ The questions propounded are not so imprecise as to be insufficient to support a

perjury conviction as a matter of law. We agree with the defendant that the questions were not as clear, precise, and narrow as they should have been.[11]  However, this only means that the government has made it more difficult to prove that the questions were knowingly and intentionally answered falsely.

### (B)

■ The defendant next argues that the evidence was insufficient to support the verdict.  This argument is without merit. " '[I]f there is *substantial* evidence, taking the view most favorable to the government,' " "the verdict of a jury is to be sustained."  *United States v. Malatesta*, 590 F.2d 1379, 1382 (5th Cir.) (en banc) (emphasis by the court), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979) and 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979), *quoting Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).  In the instant case, the grand jury testimony of Eugene Knighton, which was admitted as substantive evidence, Fed.R. Evid. 801(d)(1)(A), constituted substantial evidence of the defendant's guilt with respect to Count I.  Record on Appeal, Volume III at 382, 384–87, 393, 405–07.[12]

### (C)

■ The defendant finally contends that his grand jury testimony should have been suppressed because he was not told that he was a potential defendant and was not advised of his constitutional rights under the Fifth Amendment.  The defendant concedes that such warnings are not constitutionally required, *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977), but he asks this court to exercise its supervisory jurisdiction to enforce the "better practice" of informing a potential defendant of his constitutional rights.  *United States v. Jacobs*, 531 F.2d 87 (2d Cir.), *vacated and remanded*, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277, *aff'd on remand*, 547 F.2d 772 (2d Cir. 1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978).

---

**11.** The conjunctive nature of the questioning opened a Pandora's box of objections based on ambiguity.  As discussed in the text, the questions were not so inherently ambiguous that they cannot support an indictment for perjury, but they nevertheless were unnecessarily complex.

Additional problems were created by asking the defendant whether he had *stated to anyone* that he knew of or had heard of certain payoffs rather than directly asking him whether he actually knew of or had heard of such payments.  The questions failed to inquire about the information that the grand jury was presumably most interested in.  It seems likely that in investigating the alleged kickbacks, the grand jury was more interested in what the defendant knew than in what the defendant had told to other people.

Even more problematically, the form of the questions makes it difficult to determine whether statements made by the defendant while soliciting kickbacks were encompassed by the questions propounded to him before the grand jury.  The defendant was asked whether he had *stated to anyone* that he knew of or had heard of payments to Spaulding.  Consequently, if the defendant had said to Knighton, "I know that Spaulding is taking payoffs," then he clearly perjured himself before the grand jury.  However, it is not completely clear that perjury would be proved by evidence that while soliciting kickbacks from Richardson the defendant stated, "Give me $25 per week for Spaulding, and he'll see that you're one of the last ones laid off."  This is a statement that indicates knowledge, but it is not necessarily a statement of knowledge.  To this extent, it is possible that the question was ambiguous or that the defendant thought that his answers were literally true, at least with respect to statements made while soliciting kickbacks.

Similarly, there is some question whether the preface to the defendant's alleged question to Richardson, "Well you didn't pay A. J. anything for your book after paying $25 a week, did you?", would support a perjury conviction.  Again, it is a statement by the defendant, albeit in the form of a question, that implies or indicates knowledge, but it is not unquestionably a statement of knowledge.

**12.** Grand jury testimony of Eugene Knighton, which concerned conversations between him and the defendant Whitaker, was received in evidence when Knighton at trial could not recall such conversations.  Knighton had admitted, for example, that Whitaker had spoken to him of the under-the-table payments made to Spaulding, Record on Appeal, Volume III at 382, that Whitaker had told him that Spaulding was raking in a couple of thousand dollars a week, *id.* at 385, and that Whitaker had said that the money was being paid to Spaulding by the permit people, *id.* at 386.

Although we agree that it is a better practice to so inform a potential defendant prior to his testimony before a grand jury,[13] this is not an appropriate case for an exercise of our supervisory jurisdiction.

■ In *Jacobs* the court suppressed the defendant's grand jury testimony in a case where the perjury count was "essentially a strategic ploy which would make conviction on the substantive count easier if the counts were to be joined in a single trial." *United States v. Jacobs*, 547 F.2d 772, 775 (2d Cir. 1976) (on remand), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978). In the instant case, however, there is no evidence that the government was attempting to set a trap for the defendant. There is some indication that the defendant may have been a target at the time of his testimony,[14] but there are also indications that the government expected the defendant to testify truthfully and did not intend to prosecute him for the substantive offense being investigated.[15] In fact, distinguishably from *Jacobs*, the defendant was never charged with a substantive offense. Under the circumstances of this case, we decline to exercise our supervisory jurisdiction to suppress the defendant's grand jury testimony.

*Conclusion*

In view of the prejudicially erroneous admission of the irrelevant evidence concerning the Bronco truck, the conviction is REVERSED and the case is REMANDED for a new trial.

REVERSED AND REMANDED.

---

**13.** *See* ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function (Approved Draft 1971) § 3.6(d):

> If the prosecutor believes that a witness is a potential defendant he should not seek to compel his testimony before the grand jury without informing him that he may be charged and that he should seek independent legal advice concerning his rights.

**14.** Almost every witness before the grand jury was apparently specifically asked whether Wayne Whitaker had been seen taking payoffs and whether Whitaker was known to be making payoffs to Spaulding. Record on Appeal, Volume VII at 15–16.

**15.** In arguing against the defendant's motion to suppress the grand jury testimony, the prosecutor stated that the grand jury had information that Whitaker would testify truthfully, and he also stated that Whitaker was "more or less" advised that the grand jury "considered him to be a victim of this operation that was chiefly headed by Mr. Andrew Spaulding." Record on Appeal, Volume VII at 22. The prosecutor also stated that Whitaker would not have been considered "a target of the substantive underlying investigation" had he told the truth. *Id.* at 23. *See generally id.* at 22–23.